

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-20-2009

# Acumed LLC v. Advanced Surgical

Precedential or Non-Precedential: Precedential

Docket No. 07-1869

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Acumed LLC v. Advanced Surgical" (2009). *2009 Decisions.* Paper 1622.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1622

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 07-1869 and 07-2562

_____

ACUMED LLC, A DELAWARE LIMITED
LIABILITY CORPORATION; SURGICAL
RESOURCES OF PENNSYLVANIA, INC.

v.

ADVANCED SURGICAL SERVICES, INC.;
ROBERT MORRIS, AN INDIVIDUAL,

Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 05-02711)
Honorable Juan R. Sanchez, District Judge

_____

Argued December 2, 2008

_____

BEFORE: AMBRO and GREENBERG, <u>Circuit</u> Judges,
and RODRIGUEZ,\* <u>District</u> <u>Judge</u>

Filed: March 20, 2009

_____

Michael L. Eidel (argued)
Erin L. Ginsburg
DLA Piper
1650 Market Street
One Liberty Place, 50th Floor
Philadelphia, PA 19103-0000

Bruce W. McCullough (argued)
McCullough & McKenty
1225 North King Street
P.O. Box 397, Suited 1100
Wilmington, DE 19899-0000


        <u>Attorneys for Appelles</u>

Gary Green (argued)
Sidkoff, Pincus & Green
1101 Market Street

_____

\*The Honorable Joseph H. Rodriguez, Judge of the United
States District Court for the District of New Jersey, sitting by
designation.

2

Suite 2700
Philadelphia, PA 19107-0000

<u>Attorneys for Appellants</u>

OPINION OF THE COURT

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.  INTRODUCTION

This matter comes on before this Court on an appeal from a final order entered in the District Court on May 21, 2007, accompanying an opinion dated May 18, 2007, as well as from a separate judgment for compensatory and punitive damages in this case involving claims and counterclaims among parties in the surgical implant business.  <u>See</u> <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, Civ. No. 05-2711, 2007 WL 1500051 (E.D. Pa. May 18, 2007).  The District Court entered the order and judgment from which appellants, Advanced Surgical Services, Inc. ("Advanced") and Robert C. Morris ("Morris"), have taken their appeal, in favor of appellees Acumed LLC ("Acumed") and Surgical Resources of Pennsylvania, Inc. ("Surgical").[1]  Inasmuch as Morris is the president and sole

---

[1]The notice of appeal as amended specifies earlier orders included in the May 21, 2007 order, but it is unnecessary to list them as our disposition of this appeal is clear without the

owner of Advanced, as a matter of convenience we usually refer to appellants singularly as "appellant." In addition, appellant filed an earlier appeal from a March 22, 2007 order holding it in contempt of court and ordering it to pay a counsel fee that appellant characterizes as a fine. The clerk of this Court consolidated the appeals by order of May 31, 2007, and we address both in this opinion. The May 21, 2007 order, as well as providing for damages, entered an injunction against appellant and denied its post-trial motions in which it sought a judgment as a matter of law under Fed. R. Civ. P. 50(b) or, in the alternative, an order amending the judgment and a remittur of damages, a new trial, and orders assessing attorneys' fees and sanctions against appellees.

Appellant challenges (1) the denial of its motion for judgment as a matter of law on appellees' claims; (2) the award of damages, particularly punitive damages, against it; (3) the grant of partial summary judgment in favor of appellees on appellant's counterclaim for abuse of process, unfair competition, and defamation; (4) the grant of a judgment as a matter of law in favor of appellees on appellant's counterclaim for tortious interference with contractual relationships; (5) certain of the District Court's evidentiary rulings; (6) the denial of appellant's application for attorneys' fees; (7) the grant of injunctive relief against it; and (8) the order holding appellant in contempt of court.[2] Though both appellees prevailed only in

specification.

[2] In its opening brief, appellant listed an issue whether "the District Court erred in allowing two lawyers for Surgical to

4

certain aspects of this case, neither cross-appeals from any disposition in the District Court adverse to it.

For the reasons we discuss below, we conclude that the application of legal principles required the District Court to have granted appellant's post-trial Rule 50(b) motion seeking to set aside the jury's verdict in favor of appellees on a tortious interference with contractual relationship claim that appellees pled against appellant and attempted to prove at trial.[3] Therefore, we will reverse the District Court's determination

_____

participate in the trial as if they represented separate parties." Appellant's br. at 3. Appellant, however, did not advance this issue in the substantive portions of its briefs beyond reiterating in the summary of its argument that the District Court "improperly allowed two lawyers for Surgical to participate in the trial as if they represented separate parties," appellant's br. at 24, and thus it has waived the issue. See United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). In any event, the argument is not meritorious as it was well within the District Court's discretion in managing the trial to allow the representation. See United States v. Wecht, 484 F.3d 194, 217 (3d Cir. 2007) ("[D]istrict courts have wide discretion in the management of their cases.").

[3]As a matter of convenience we usually will refer to the tortious interference with existing or prospective contractual relationships claim as the tortious interference with contractual relationships claim or the tortious interference claim.

that appellant was not entitled to judgment as a matter of law on that claim and reverse, as well, the judgment for compensatory and punitive damages, as the jury predicated the damages verdict solely on the tortious interference claim. Furthermore, we will reverse the order for the injunction against appellant inasmuch as the District Court predicated the injunction on the jury's liability finding on the tortious inference claim, but we will affirm all of the District Court's remaining orders. Inasmuch as we are not remanding the case for a new trial or other proceedings, our disposition on this appeal will bring this litigation to a close.

## II. BACKGROUND

A. Facts

To the extent that appellant challenges the order granting partial summary judgment against it, we state the facts most favorably to it, but to the extent that the appeal challenges the jury's verdict, we state the facts on any disputed issue most consistently with the verdict. See Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003).

Acumed is a manufacturer of surgical implants and related devices, and appellant and Surgical are in the business of distributing surgical implants and other medical devices for various manufacturers, including Acumed, to hospitals and surgeons. Acumed and Morris began a relationship in 1996 when Joe Richioni, then Acumed's authorized sales

representative for eastern Pennsylvania, retained Morris as an independent contractor to sell Acumed's products. In 1998, due to Acumed's dissatisfaction with Richioni's performance, Morris and two other individuals formed a "loose partnership" called RMW Orthopedics ("RMW") that contracted with Acumed to take over Richioni's territory.[4] App. at 2955. At that time Acumed and RMW signed a Manufacturer's Representative Agreement ("RMW Agreement") designating RMW as Acumed's exclusive representative for its products in eastern Pennsylvania. Morris became Acumed's authorized representative for the greater Philadelphia area. The RMW Agreement contained a provision that prevented RMW from making unauthorized disclosure of Acumed's confidential information. The non-disclosure provision provided for the award of attorney's fees to the prevailing party in the event of litigation related to the provision.

In late 1999, its "loose partners" dissolved RMW, following which Acumed contracted with Morris's company, Advanced, for it to become Acumed's exclusive sales representative in southeastern Pennsylvania. Appellant and Acumed differ, however, on the nature of their sales representative agreement. Ordinarily the written terms of an agreement should be clear, though their meaning may be in dispute, but the situation here varies from the ordinary because Acumed presented evidence explaining the terms of its agreement with Advanced, but did not produce a written contract between Advanced and Acumed. For its part, appellant produced a contract purportedly evidencing the agreement

---

[4]The "M" in RMW is Morris.

Advanced and Acumed reached, but neither party had signed that version of the contract, and the parties' versions of the agreement significantly varied. Nevertheless, we will refer to the agreement, as uncertain as its terms may be, between Advanced and Acumed as the "Advanced-Acumed Agreement."

Throughout the trial and this appeal, Acumed has maintained that Advanced was its commissioned sales representative under an agreement identical to the earlier RMW Agreement, and, in that capacity, placed orders from surgeons and hospitals with Acumed, who then shipped the product directly to its purchaser. Nevertheless, even as a sales representative appellant may have had Acumed's products on hand as consignment inventory for direct delivery to an ordering surgeon or hospital. In any event, regardless of how appellant or Acumed filled the order, when a purchaser paid Acumed on an invoice for a sale that appellant had obtained, Acumed paid appellant a commission.

In contrast to Acumed's version of their contractual relationship, appellant argued and still argues that its contract with Acumed was a "hybrid" agreement under which it acted both as a sales representative and a stocking distributor. Appellant contended that in its role as a stocking distributor, it purchased products directly from Acumed for resale to hospitals or surgeons. Appellant further alleged that under the terms of the Advanced-Acumed Agreement, if Acumed terminated the agreement, Acumed would pay a "buy-out" fee to appellant. Appellant explains that it sought "buy-out" fees from the manufacturers it represented to compensate it for its expenses in

promoting a manufacturer's product if the manufacturer terminated appellant as a representative and thereby deprived appellant of the opportunity to earn further commissions on the sales of the manufacturer's products. Appellant believed that when a manufacturer terminated its distributorship it should pay appellant such a fee, inasmuch as appellant would have promoted the manufacturer's products while representing the manufacturer and there could be further sales of a manufacturer's products attributable to appellant's efforts after a manufacturer terminated appellant as a sales representative. It appears that sometimes a buy-out fee became payable when another company acquired the manufacturer that appellant had represented and appellant then lost the account. Indeed, appellant sets forth in its brief that Acumed "was bought out by a conglomerate in around 2000." Appellant's br. at 11 n.4.[5]

In January 2000, during the time of the Advanced-Acumed relationship, appellant sometimes bought Acumed products under the name Allied Surgical ("Allied"), an unincorporated entity not to be confused with appellee Surgical Resources of Pennsylvania or appellant Advanced Surgical Services. Appellant contended that it formed Allied so that it

---

[5]On the other hand, at oral argument appellant's attorney told us that "[Morris] was terminated in this case because he refused to accept Acumed's sales representative agreement after he had already been operating under his hybrid agreement for about 18 months. He was not terminated. It was not renewed . . . . [H]e was told that we are not renewing your contract because the new owners only want to have sales rep contracts." Transcript of oral argument at 8, 11.

could sell products in hospitals that had not approved Acumed as a vendor. On the other hand, Acumed contended that it believed during the Advanced-Acumed relationship that Allied was an entity separate from and independent of appellant. Moreover, it contended that Morris formed Allied in order to purchase Acumed products secretly for resale on his own account to hospitals and surgeons.

In January 2001, Acumed, citing what it believed was appellant's poor sales performance, terminated the Advanced-Acumed Agreement. Morris testified that after the termination of the contract he returned the inventory that appellant had acquired in its sales representative role from Acumed and attempted to sell back to Acumed inventory it had acquired as a stocking distributor, but Acumed refused to buy back the inventory. Morris also testified that after Acumed terminated Advanced's contract, appellant continued to sell Acumed products from 2001 to 2004 in eastern Pennsylvania and New Jersey as well as in areas beyond its former exclusive territory under the Advanced-Acumed Agreement. According to appellant, the sales, however, were sporadic, and appellant only sold Acumed products when customers specifically requested them. Morris estimated that appellant made approximately 25 sales of Acumed products to ten different customers during the three-year period.

In September 2002, Surgical and Acumed entered into an agreement designating Surgical as Acumed's exclusive sales agent in eastern Pennsylvania and southern New Jersey; Surgical thus took over what had been Advanced's territory. It is, of course, evident that there was a hiatus between the periods

10

in which appellant and Surgical served as sales representatives for Acumed.

Sometime after Surgical became an Acumed sales representative, an employee at Bloomsburg Hospital in Pennsylvania advised Fred Zullo, then the Vice President of Surgical, that a representative from another company had indicated to the hospital staff that he could provide Acumed products. This information led Acumed to send a memorandum dated October 9, 2003, to its customers in eastern Pennsylvania and New Jersey informing them that Surgical was its only authorized representative in that territory and Acumed would not extend its warranty to its products sold by anyone other than its authorized sales representative.

In December 2004, Chad Casey, a Surgical sales representative, brought Acumed implants and instruments to Nazareth Hospital for use in a surgical procedure. When Casey arrived at Nazareth, he discovered that another person already had delivered a set of Acumed implants to Nazareth for the procedure.

At the trial, Ryan Crognale, a sales representative for appellant, explained his view of the events that Casey described at Nazareth Hospital. Crognale testified that Morris directed him to deliver the implants to Nazareth and to attend the surgery. He then stated that after his earlier delivery of Acumed implants, he returned to the hospital and saw Casey in the operating room and observed that the physician doing the procedure was "not using my stuff anyway." App. at 2158. Consequently, Crognale took the tray of instruments he

11

previously had delivered and left the operating room. Thus, it appears that the physician performing the procedure used materials Acumed supplied through Surgical, its authorized representative.

As Crognale was leaving the surgery center, he encountered Casey, and an argument between the two representatives ensued. Appellant contends that during the argument Casey loudly accused Crognale of illegally selling Acumed inventory, an incident that appellant contends led Dr. Robert Frederick, a doctor at Nazareth, to stop doing business with it. Moreover, appellant contends that because of Dr. Frederick's connection with a large group of physicians in Philadelphia, the confrontation was a factor in a decision by Jefferson Hospital in Philadelphia to exclude Morris from its operating theater for one year. As a result of the incident at Nazareth Hospital, Acumed sent another notice to its customers stating that Surgical was its only authorized representative in eastern Pennsylvania and southern New Jersey.

B. Procedural History

Appellees filed the complaint in this action against appellant in the District Court charging it with violation of the Lanham Act, 15 U.S.C. § 1125, violation of Pennsylvania's Anti-Dilution statute, 54 Pa. Cons. Stat. Ann. § 1124 (West 1996), unfair competition, breach of a non-disclosure provision in the Advanced-Acumed Agreement, conversion, unjust enrichment, and tortious interference with existing or prospective contractual relationships. Appellees sought compensatory and punitive damages and an injunction

12

precluding appellant from making what Acumed regarded as unauthorized sales of its products. Later, when appellees claim they just had become aware that Morris had formed Allied, appellees amended their complaint to include a charge of intentional misrepresentation. The amendment to the complaint asserted that Acumed had made sales to Allied believing, on the basis of Morris's representations, that Allied was an entity separate from and independent of Advanced and was "wholly distinct from" appellant whereas, in fact, "Allied was the alter ego of Advanced." App. at 346. Acumed alleged that but for Morris's misrepresentations it would not have sold its products to Allied. Appellees brought all of their claims under state law except for the Lanham Act claim which, of course, was a federal law claim.

Appellees asserted their claims for tortious interference with contractual relationships on two theories. First, appellees alleged that appellant tortiously interfered with Acumed's and Surgical's contractual relationship providing for Surgical within its territory to be Acumed's sole authorized dealer by making false and misleading statements regarding Advanced's status. Second, Acumed alleged that appellant's sale of Acumed products and false and misleading statements tortiously interfered with Surgical's and Acumed's relationships with existing and prospective customers. Appellees charged in their Lanham Act claim that appellant made false and misleading statements to hold itself out as an authorized representative of Acumed in southeastern Pennsylvania and New Jersey.

Appellant filed a four-count counterclaim against appellees. In counts I, II, and III appellant charged that Acumed

13

breached its contract with appellant by not providing timely notice of termination of their relationship and by failing to pay the contractually required buy-out fee that became due to appellant when Acumed terminated their relationship. In addition, appellant charged that Acumed's failure to pay the buy-out fee violated the Pennsylvania Commissioned Sales Representatives statute, 43 Pa. Cons. Stat. Ann. §§ 1471 et seq. (West 1991). In count IV ("counterclaim IV") appellant alleged that Acumed and Surgical ". . .converted property belonging to Advanced, defamed and disparaged Advanced maliciously and falsely, intentionally interfered with Advanced's contractual and business relationships and competed unfairly against Advanced." App. at 103.

After completion of discovery, appellant filed a motion to dismiss or, in the alternative, for summary judgment, and the parties submitted letter briefs addressing summary judgment issues.[6] After hearing oral arguments on the letter briefs on

---

[6]In their brief on this appeal, appellees state that the District Court "gave the parties two weeks notice that it would hear arguments on summary judgment issues and directed the parties to brief those issues." Appellees' br. at 87. However, the order which appellees cite as supporting this statement was dated December 4, 2006, and did not refer to briefs, though it did provide that "[d]ispositive motions shall be filed on or before February 9, 2007." App. at 3. In an order dated February 6, 2007, the Court ordered that "a pre-motion argument is scheduled for February 23, 2007." App. at 3D. The record, however, makes clear that appellant filed a letter brief dated February 22, 2007, and appellees filed two letter briefs also

14

February 23, 2007, the District Court signed an order on March 6, 2007, entered on March 7, 2007, which dismissed counterclaim IV insofar as it alleged that appellees were liable to appellant for instituting groundless litigation, defamation, and unlawful restraint of trade. But the District Court allowed appellant to proceed with counterclaim IV to the extent that it alleged that appellees were liable for tortious interference with one of its contracts, and it also permitted appellant to proceed on its conversion claims. The trial commenced on March 12, 2007, and on the same day, the Court granted a motion appellees made in limine to preclude appellant from introducing evidence of defamation.

On March 19, 2007, at the conclusion of appellant's testimony, Surgical moved for a judgment as a matter of law with respect to the remaining claims in counterclaim IV, and both appellees moved for judgment as a matter of law on other portions of the case. The following day the District Court entered an order granting Surgical's motion against appellant with respect to counterclaim IV but reserving judgment on the other aspects of appellees' motions for judgment, including the tortious interference with contractual relationships, conversion, and unfair competition claims. Ultimately, however, the Court granted judgment as a matter of law dismissing certain of appellant's claims that had survived the earlier dismissal of portions of counterclaim IV.

The jury returned a verdict on March 21, 2007, finding

dated February 22, 2007, on the merits of certain summary judgment issues.

for appellees on their count against appellant for tortious interference with existing or prospective contractual relationships with appellees' customers. The jury, however, rejected appellees' claim that appellant had tortiously interfered with Acumed's and Surgical's contractual relationship between themselves and also rejected appellees' other claims, including appellees' Lanham Act claims. The jury also found against appellant on the portions of its counterclaims that had survived the District Court's dismissals, i.e., the claims predicated on breach of contract and violation of the Pennsylvania Commissioned Sales Representatives statute. The jury awarded $20,000 in compensatory damages to Surgical and $0 in compensatory damages to Acumed on the tortious interference claim but found that both Acumed and Surgical were entitled to punitive damages. Thus, by the time the jury returned its verdict, either the Court or the jury had rejected all the parties' claims, except that appellees had obtained a verdict in their favor on the count for tortious interference with existing or prospective contractual relationships, though not on interference with their own relationship. Nevertheless, the Court did not discharge the jury on March 21, 2007, when it returned its initial verdict, inasmuch as the jury had not determined the quantum of punitive damages.

In anticipation of proceedings to determine the quantum of punitive damages, the Court required appellant to produce financial documents relating to its net worth.[7] On March 22,

---

[7]There seems to be a discrepancy as to when the Court ordered appellant to produce the documents, as the order requiring their production is dated March 20, 2007, but the jury

2007, when appellant failed to produce some of the documents, the District Court entered an order holding it in civil contempt of court and ordering it to pay appellees' attorneys a fee of $1350. The Court also granted appellees access to appellant's computer hard drive, and allowed appellees to cross-examine Morris about the missing documents. On March 27, 2007, appellant filed a notice of appeal from the District Court's contempt order.

On March 23, 2007, the District Court, two days after the jury returned its original verdict, allowed the parties to make arguments to the jury on the question of punitive damages. At that time the Court instructed the jury that to award punitive damages it "must return a verdict for [Acumed] in a nominal sum, such as one dollar." App. at 3494. The jury then returned a verdict awarding $1 in nominal damages to Acumed and punitive damages to both Acumed and Surgical Resources in the amount of $100,000 each.

Appellant filed post-verdict motions requesting entry of a judgment as a matter of law in its favor under Rule 50(b), or, in the alternative, entry of an amended judgment, a remittur of damages, and/or a new trial. In addition, appellant sought attorneys' fees under the Lanham Act and the Advanced-Acumed Agreement even though Acumed, but not appellant, contended that the Advanced-Acumed Agreement followed the earlier RMW Agreement and consequently contained a non-disclosure provision providing for a counsel fee in the event of litigation regarding it. Moreover, appellant requested that the

returned the liability verdict on March 21, 2007.

17

District Court impose sanctions against appellees. On the other hand, appellees filed a post-trial motion seeking an order for an injunction barring appellant from selling Acumed products. The District Court denied appellant's motions but granted appellees' request for an injunction against appellant. Accordingly, the District Court proceedings resulted in appellees recovering a judgment against appellant for compensatory and punitive damages for tortious interference with existing or prospective contractual relationships, and with the Court entering an injunction barring appellant from selling Acumed's products. No party, however, obtained any other substantive relief, though, as we have indicated, the Court made an award of attorneys' fees to appellees on the contempt of court order. Appellant then filed its second notice of appeal, which it later amended. Thus, appellant has appealed twice, but appellees, though only partially successful, have not cross-appealed.

## III. JURISDICTION AND STANDARDS OF REVIEW

The District Court had jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) and supplemental jurisdiction over all the remaining claims under 28 U.S.C. § 1367, as they were under state law and the Court did not have diversity of citizenship jurisdiction.

Courts of appeals have jurisdiction under 28 U.S.C. § 1291 over "appeals from all final decisions of the district courts." As we have indicated, appellant filed two distinct notices of appeal, the first after the District Court entered its

18

contempt order and the second, subsequently amended, after the District Court ruled on the parties' post-trial motions.

When appellant filed its first notice of appeal, the case still was pending in the District Court, a procedural posture that regularly presents a question whether a court of appeals has jurisdiction over an appeal. We need not determine, however, whether the contempt of court order was final and appealable under section 1291, or on another basis, when appellant filed its appeal from that order, because the District Court subsequently resolved all the outstanding issues and, on any theory, the case in all of its aspects then became final in the District Court and thus became appealable. Therefore, the contempt of court order, if not appealable earlier, became appealable at that time. See Aluminum Co. of Am. v. Beazer East, Inc., 124 F.3d 551, 557 (3d Cir. 1997) ("Even if the appeals court would have lacked jurisdiction at the time an appeal was filed, the court has jurisdiction if, as a result of subsequent events, there are no longer any claims left to be resolved by the district court.").

Various standards of review are applicable on this appeal. First, "[w]e review a denial of judgment as a matter of law de novo, viewing the evidence in the light most favorable to the prevailing party." Monteiro v. City of Elizabeth, 436 F.3d 397, 404 (3d Cir. 2006). On this appeal the parties have treated the applicable state law as that of Pennsylvania, and therefore so do we.[8] Ordinarily, a court may grant a judgment as a matter of law

---

[8]The parties brief certain aspects of the counsel fee issue under Oregon law, apparently because Acumed contended in its complaint that its contract with appellant followed the earlier

19

contrary to the verdict only if "the record is critically deficient of the minimum quantum of evidence" to sustain the verdict. Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995). Thus, the usual formulation of the standard of review on an appeal from the denial of a defendant's motion for judgment as a matter of law requires an appellate court to determine "whether the evidence is sufficient to sustain liability," and in considering that issue the court "may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Here, however, though we apply the well-established standard of review to our recitation of the facts, the traditional standard of review will become insufficient because we will be constrained to reverse the judgment on the appellees' tortious interference claim on a purely legal basis that does not depend on rejecting the jury's findings on the evidence at the trial. Rather, we accept those findings but conclude that the verdict itself requires that we reverse the tortious interference claim judgment against appellant by granting its motion for judgment as a matter of law.

Second, our review of a grant of summary judgment is plenary, and in making that review we use the same standard as a district court: whether there are genuine issues of material fact

---

RMW Agreement that specified disputes under it would be governed by Oregon law, probably because Acumed is an Oregon corporation. We, however, decide the counsel fee dispute without reference to Oregon law, as we hold that the provisions of the RMW Agreement are not relevant to resolution of any issue on this appeal.

precluding entry of summary judgment. E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 191 (3d Cir. 2008). Third, we review a district court's evidentiary rulings for abuse of discretion. See Moyer v. United Dominion Indus., 473 F.3d 532, 542 (3d Cir. 2007). To demonstrate that a district court abused its discretion, an appellant must show that the court's decision was "arbitrary, fanciful or clearly unreasonable." Id. (citation omitted).

To the extent that a district court as a matter of law is empowered to award attorneys' fees, we review its disposition of a request for attorneys' fees on an abuse of discretion basis. Pardini v. Allegheny Intermediate Unit, 524 F.3d 419, 422 (3d Cir. 2008). There is "[a]n abuse of discretion . . . when a district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. However, if the District Court denied the fees based on its conclusion on questions of law, our review is plenary." Id. (citation and quotation omitted). We review a contempt order on an abuse of discretion basis as well. Harris v. City of Philadelphia, 47 F.3d 1311, 1321 (3d Cir. 1995).

IV. DISCUSSION

A. Tortious Interference

We begin our analysis by addressing appellant's contention that appellees failed to establish sufficiently their claim for tortious interference with existing or prospective

21

contractual relationships. Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998).

As the foregoing formulation of the components of a tortious interference claim makes clear, Pennsylvania distinguishes between claims for interference with existing contractual relations and claims for interference with prospective contractual relations. See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 470-71 (Pa. 1979). In this case, though the jury found that appellant interfered with appellees' existing and prospective relationships with purchasing surgeons and hospitals, appellees do not direct our attention to evidence setting forth the existing contracts with which they believed appellant interfered. In fact, the only evidence appellees presented of a material existing contract was the contract between themselves. The jury, however, found that appellant's sales of Acumed products after 2001 did not interfere with the contract between Surgical and Acumed, and appellees do not challenge that outcome on this appeal. We therefore conclude

22

that the jury must have based its verdict on appellant's interference with prospective sales of Acumed products that Surgical would have made to customers in the territory in which Acumed had granted an exclusive relationship to Surgical. Indeed, the jury's award of compensatory damages only to Surgical and not to Acumed suggests that it probably reached this conclusion because, though appellees complained of appellant's sales, those sales, after all, were of Acumed products.[9]

[9]The possibly confused nature of the jury's findings is unsurprising given the instructions and verdict slip here. The instructions specifically did not (1) distinguish between tortious interference with existing contractual relations and tortious interference with prospective business relations, (2) review the relevant factors for the jury to consider beyond those pertinent once an existing contract is established, (3) mention that Acumed and Surgical needed to demonstrate that appellant specifically intended to interfere with their contracts or prospective business relations, or (4) properly state the law by noting that, in Pennsylvania, a party is not liable for tortious interference with prospective business relations for "merely making a third party's performance of his contract with another party more expensive or burdensome." Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir. 1994). Similarly, the verdict sheet required the jury to answer "yes" or "no" to the following questions:

> 15. Do you find by a preponderance of the evidence that Advanced and/or Morris intentionally interfered with the plaintiff's

23

In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively "reasonable likelihood or probability"

>        existing or prospective contractual and
>        business relationships with plaintiff's
>        customers?
>
>        . . . .
>
> 17.    Do you find that the plaintiffs are entitled
>        to an award of punitive damages as a result
>        of defendants' interference with plaintiffs'
>        contractual relations?

App. at 4121.

These questions merged interference with existing contractual relationships and interference with prospective contractual relationships into one tort, seemingly violating the general rule that verdict slips should "avoid questions that combine two issues disjunctively because a 'yes' or 'no' answer may refer to either issue." 9A Wright & Miller, Fed. Practice & Procedure § 2508, at 189 (1995). They also grouped Acumed and Surgical together even though their contractual interests and claimed damages were different. Nevertheless, considering our overall conclusion in this case, the possible errors in the charge that we identify were harmless to appellees against whom we are holding on this appeal from their favorable tortious interference judgment, and even if they objected at trial on the basis of these errors, we would not order a new trial by reason of the form of the verdict.

24

that the contemplated contract would have materialized absent the defendant's interference. See Glenn v. Point Park Coll., 272 A.2d 895, 898-99 (Pa. 1971); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997). A "reasonable likelihood" of occurrence is something less than a contractual right but more than a mere hope that there will be a future contract. Phillips v. Selig, 959 A.2d 420, 428 (Pa. Super. Ct. 2008). Furthermore, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. Id. at 429.

Morris, in uncontradicted testimony, explained that appellant only sold Acumed products after the termination of the Advanced-Acumed Agreement when customers specifically requested that appellant supply the Acumed brand. Furthermore, it is undisputed that at the times material to this case appellant and Surgical were the only distributors of Acumed products in the eastern Pennsylvania and southern New Jersey region. Therefore, inasmuch as it appears that Surgical was the only distributor of Acumed products in its territory other than appellant, and the customers stated their preference specifically for Acumed products, the customers may have entered into contractual relationships with Acumed or its authorized representative, Surgical, for the purchase of Acumed products but for appellant's sales of those products.[10] On the

---

[10]Acumed terminated its contract with Advanced in January 2001, but Acumed and Surgical did not initiate their contractual relationship until September 2002. Therefore, inasmuch as the parties did not pinpoint the dates of appellant's 25 sales after January 2001, it is possible that Advanced made some of the

other hand, there was evidence at the trial that there was a secondary market for Acumed products in which suppliers other than the parties to this litigation supplied those products and, in addition, there was evidence that former stocking distributors of

sales before Surgical became the exclusive dealer for Acumed products in eastern Pennsylvania and New Jersey. When questioned on this matter at oral argument, Acumed's counsel conceded that any sales which were proven to be between January 2001 and September 2002 could not constitute tortious interference, but also asserted that any Acumed sales appellant made during that time outside of the Pennsylvania and New Jersey territory constituted interference in some sales representative's exclusive territory. These circumstances undermine the basis for the jury's calculation of compensatory damages in favor of Surgical because the jury may have based its award of those damages on all 25 sales, and there could be a question of the relevancy of a portion of the evidence supporting the verdict. This problem would cast doubt on the validity of the damages verdict even though the law does not require exact precision in the calculation of damages. See Rochez Bros., Inc v. Rhoades, 527 F.2d 891, 895 (3d Cir. 1975). However, we need not linger on the question whether the evidence supporting the jury's award of compensatory damages to Surgical has been undermined inasmuch as we find that appellees did not establish that appellant's sales of Acumed products were wrongful. Accordingly, the sales, whenever appellant made them, could not be the predicate for a finding that appellant tortiously interfered with the relationship between Surgical and Acumed or between appellees and third-party purchasers of Acumed products.

26

Acumed products sold their inventory in an unrestricted manner after the termination of their authorized distributorships. Accordingly, we cannot be confident that appellees have satisfied their burden to prove that if appellant had not sold Acumed products there is a reasonable likelihood that appellees would have made those sales.

Moreover, even if we concluded that appellees established that but for appellant's sales of Acumed products there is a reasonable likelihood that the customers to whom appellant made sales would have entered into contractual relationships with appellees, and appellees therefore satisfied a necessary part of their case, we still would have to consider whether appellees were able to establish the second and third elements of the tortious interference with contractual relationships formulation, i.e., whether appellees demonstrated that there was a sufficient showing of appellant's intent to interfere with appellees' prospective relationships and whether appellant was privileged or justified in its actions. We prefer to pass directly to a consideration of those elements, particularly the third element, of appellees' case. The second and third elements are related closely because in most cases a defendant's intentional conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff . . . ." Id. at 430 (quoting Glenn, 272 A.2d at 899). We will discuss only the third element of a tortious interference claim inasmuch as we find that regardless of whether appellant intended to interfere with appellees' prospective contractual relationships, even viewing the evidence in a way so that it is most consistent with the verdict, as a matter of law appellant was privileged to interfere with those prospective

27

relationships.[11]

As we indicated above, to recover on a tortious intentional interference with existing or prospective contractual relationships claim in Pennsylvania, a plaintiff must prove that the defendant was not privileged or justified in interfering with its contracts: "While some jurisdictions consider a justification for a defendant's interference to be an affirmative defense, Pennsylvania courts require the plaintiff, as part of his prima facie case, to show that the defendant's conduct was not justified." Triffin v. Janssen, 626 A.2d 571, 574 n.3 (Pa. Super. Ct. 1993) (citing Thompson Coal 412 A.2d at 471 n.7); Silver v. Mendel, 894 F.2d 598, 602 n.6 (3d Cir. 1990). We hasten to add, however, that our conclusion does not depend on the allocation of the burden of proof on the privilege issue, as we would reach our result even if appellant had the burden of proof to establish the privilege as a defense, because the evidence established conclusively that appellant did so.

Pennsylvania has adopted section 768 of the Restatement (Second) of Torts, which recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships. See Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. Ct. 1988).

---

[11]Though we discuss the privilege issue in terms of prospective relationships because the 25 sales after termination of the Advanced-Acumed Agreement constitute the alleged interfering conduct, our analysis would not change if we characterized the question of privilege in terms of existing relationships.

The law necessarily recognizes this privilege because if more than one party seeks to sell similar products to prospective purchasers, both necessarily are interfering with the other's attempt to do the same thing. Moreover, even if an entity has an existing contractual relationship with another entity, a stranger to the relationship must be privileged to seek to replace one of the entities lest competition be stifled. Thus, under section 768: "[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if: (a) the relation concerns a matter involved in the competition between the actor and the other; (b) the actor does not employ wrongful means; (c) his action does not create or continue an unlawful restraint of trade; and (d) his purpose is at least in part to advance his interest in competing with the other."

Clearly, the record requires a conclusion that appellant's sales met the four components of a section 768 justification defense with the possible exception of the second element, the use of wrongful means in the interference. Thus, we confine our discussion to that element, which is the only one that we regard as being in real issue on this appeal. With respect to this element, appellant argues that it was not precluded from competing with Surgical within Surgical's exclusive territory and it did not employ wrongful means in selling its inventory of Acumed products after Acumed terminated its relationship with it. Appellees counter this argument by pointing to evidence that they believe shows that appellant illegitimately acquired Acumed products. Moreover, appellees contend that even if appellant acquired the Acumed products legitimately, appellant

29

is not entitled to the shield of the competition privilege because it used wrongful means to make the sales after the termination of the Advanced-Acumed Agreement by selling Acumed products in Surgical's exclusive territory.

Comment e to section 768 elaborates on the type of conduct that constitutes wrongful means: "If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section." Courts relying on comment e have interpreted the wrongful means element to require that a plaintiff, to be successful in a tortious interference action, demonstrate that a defendant engaged in conduct that was actionable on a basis independent of the interference claim. See Brokerage Concepts, 140 F.3d at 531 (citing DP-Tek, Inc. v. A T & T Global Info. Solutions Co., 100 F.3d 828, 833-35 (10th Cir. 1996)). Moreover, we noted in 2000 that even though the Pennsylvania courts have not interpreted the "wrongful means" element of section 768, it is likely that the Pennsylvania Supreme Court would adopt this meaning, that is, for conduct to be wrongful it must be actionable for a reason independent from the claim of tortious interference itself. See Nat'l Data Payment Sys., Inc. v. Meridian Bank, 212 F.3d 849, 858 (3d Cir. 2000); see also CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 389 (3d Cir. 2004). Nothing in later Pennsylvania Supreme Court decisions to which the parties have directed our attention or of which we are aware leads us to change our view of this issue.

We addressed the wrongful means element of section 768 in National Data, a case in which the plaintiff, National Data Payment Systems ("NDPS"), sued Meridian Bank and Corestates Financial Group ("Corestates") under Pennsylvania law for tortious interference with, and breach of, a contract for NDPS to purchase Meridian's merchant credit card business. 212 F.3d at 851. NDPS alleged that Corestates made fraudulent statements to induce Meridian not to sell its credit card business to NDPS, the interest of Corestates in blocking that potential sale being that it had announced its intent to acquire Meridian, an acquisition that Corestates wanted to include Meridian's credit card business. Id. at 858. We found that statements made by a Corestates senior executive did not meet the Pennsylvania requirements for fraud and therefore Corestates was privileged to compete with NDPS under section 768. Accordingly, Corestates was "protected for liability for tortious interference with contractual relations" because NDPS did not demonstrate that Corestate's interference gave rise to an independent cause of action. Id.

In our case, the jury, in an unappealed determination, found that appellees did not prove their cause of action predicated on appellant's allegedly fraudulent conduct. Appellees thus did not establish that appellant was independently liable to them for that conduct. In this regard, we note that although appellees submitted documentary and testimonial evidence of a dispute between appellant and Acumed over inventory after the Advanced-Acumed contractual relationship ended in 2001, the jury rejected appellees' allegations that appellant was liable to Acumed on theories of conversion, breach of contract, and unjust enrichment based on

31

appellant's retention of Acumed products after termination of its relationship with Acumed.

In view of the jury's determination that the evidence did not support a verdict that appellant's conduct was independently actionable, we conclude as a matter of law that the tortious interference verdict cannot stand against appellant, even if without the adverse verdict appellees' case would have survived appellant's Rule 50(b) motion. In reaching that conclusion, we have not overlooked appellees' allegation set forth in an amendment to its complaint that during the time appellant was Acumed's exclusive sales representative, Morris secretly formed Allied to buy products directly from Acumed and resell them to their users. Rather, we conclude that the allegation cannot save appellees' verdict on the tortious interference with contractual relationships claim because the jury did not find that appellant's conduct through Allied constituted fraudulent misrepresentation. Finally, appellees' Lanham Act charge against appellant cannot save their tortious inference claim because the jury did not find that appellant violated federal trademark laws through its sales of Acumed products. In short, appellees do not direct our attention to any claim that appellant engaged in legally actionable conduct which the jury did not reject at the trial. It therefore follows that appellees did not establish that appellant's actions in interfering with their contracts were not justified.

In reaching our conclusion that appellant is entitled to a judgment as a matter of law on the tortious interference claim because the jury found that appellant's conduct was not independently actionable, we have considered Mosley v. Wilson, 102 F.3d 85 (3d Cir. 1996), and Boyanowski v. Capital

32

Area Intermediate Unit, 215 F.3d 396 (3d Cir. 2000). In Mosley, we held that the district court erroneously granted judgment as a matter of law to resolve a jury's legally inconsistent verdicts. The plaintiff in Mosley sued the defendant, a police officer, under 42 U.S.C. § 1983 alleging that the defendant arrested him without probable cause. The plaintiff also brought, inter alia, a supplemental state law tort action for malicious prosecution. Mosley, 102 F.3d at 88. The jury returned a verdict in favor of the plaintiff on the state law claim of malicious prosecution but found for the defendant on the section 1983 arrest without probable cause count. Id. The defendant then moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, arguing that the verdict on the malicious prosecution charge was inconsistent with the verdict in his favor on the civil rights claim. The district court granted the motion, reasoning that "because the jury must have found probable cause existed to find for [the defendant] on the unlawful arrest claim, and because probable cause for arrest is a necessary element in the malicious prosecution claim, the verdicts were legally inconsistent." Mosley, 102 F.3d at 88-89 (internal quotation marks omitted).

On the plaintiff's appeal, we found that the district court erred as a matter of law in reversing the jury's verdict on the malicious prosecution claim merely because the verdict was inconsistent with the jury's verdict on the civil rights claim. Id. at 91. First, we noted that the Federal Rules of Civil Procedure suggested the inappropriateness of entering judgment as a matter of law solely on the basis of inconsistent verdicts. Id. at 90. Specifically, we pointed out that a Rule 50 post-trial motion must be made on grounds that the movant raised previously in

33

a motion for a directed verdict before the submission of the case to the jury, an obvious impossibility when the claim is that a verdict is inconsistent. Id.

Next, looking to Justice Stevens' dissent in City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571 (1986) (per curiam),[12] we outlined four approaches that a district court may take when facing an inconsistent verdict: a court may (1) allow an apparently inconsistent verdict to stand;[13] (2) read the verdict

---

[12] In Heller, the plaintiff sued two police officers and the City of Los Angeles and its police department alleging unlawful arrest and excessive force under 42 U.S.C. § 1983. The district court granted summary judgment in favor of one of the officers and held a bifurcated trial allowing the plaintiff to present his claims against the remaining officer. After the jury found in favor of the police officer, the court dismissed all charges against the City of Los Angeles and its police department. Heller, 475 U.S. at 798, 106 S.Ct. at 1572. The Supreme Court agreed with the district court, reasoning that the city and the police department could not be held liable if the jury exonerated the individual police officers: "if the [police officer] inflicted no constitutional injury on the respondent, it is inconceivable that petitioners could be held liable." Heller, 475 U.S. at 799, 106 S.Ct. at 1573.

[13] "Those circumstances are where the verdict appears to be the result of compromise as opposed to jury confusion." Montgomery County v. Microvote Corp., 320 F.3d 440, 451 n.5 (3d Cir. 2003) (citing Heller, 475 U.S. at 805 n.12, 806 n.13, 106 S.Ct. at 1576 n.12, n.13) (Stevens, J., dissenting)).

34

in a manner that will resolve the inconsistencies; (3) resubmit the question to the jury; and finally, (4) "if verdicts are genuinely inconsistent and if the evidence might support either of the 'inconsistent' verdicts, the appropriate remedy is ordinarily . . . not simply to accept one verdict and dismiss the other, but to order an entirely new trial." Mosley, 102 F.3d at 90-91 (quoting Heller, 475 U.S. at 806, 106 S.Ct. at 1577).[14] We pointed out "none of the approaches referred to by Justice Stevens supports the action of the district court in [Mosley], i.e., directing a judgment notwithstanding the jury's verdict on one claim on the sole ground that it was inconsistent with the jury's verdict on another claim." Id. at 91.

Notwithstanding Mosley, four years later we held that a judgment as a matter of law was the proper remedy where a jury reached an internally incompatible verdict in a civil conspiracy case, though we did not cite Rule 50(b). Boyanowski, 215 F.3d at 407. Boyanowski involved two separate jury verdicts in favor of a husband and wife in their respective suits against a local government and its officials. Dorothy Boyanowski alleged that the defendant, CAIU, conspired to tortiously interfere with her contractual rights. Id. at 398. The jury found in her favor on her civil conspiracy complaint while rejecting her claim for tortious interference. The district court entered judgment for Dorothy Boyanowski on the conspiracy claim and for the CAIU on the tortious interference claim. On appeal, we reversed and

---

[14] Justice Stevens noted that the Court's rule in criminal cases, which allows inconsistent verdicts to stand, is less clear than the rule in civil cases. Heller, 475 U.S. at 804-05, 106 S.Ct. at 1576.

35

ordered the district court to enter judgment in favor of the defendants on all counts. Id. at 407. As germane to Dorothy Boyanowski's claim, under Pennsylvania law a claim for civil conspiracy cannot be pled without also alleging an underlying tort. See, e.g., Pelagatti v. Cohen, 536 A.2d 1337, 1342 (Pa. Super. Ct. 1987). We predicted that the Pennsylvania Supreme Court would extend that rule to overturn a jury verdict for civil conspiracy if the jury did not find liability on the underlying tort. Boyanowski, 215 F.3d at 407. In reaching our conclusion, we cited to a Pennsylvania Superior Court decision in a conspiracy to commit fraud action in which the court found that the "failure of the underlying fraud claim sufficed as a matter of law to vitiate the finding of civil conspiracy notwithstanding the fact that it had been successfully pled as an independent cause of action." Id. (emphasis in original). While acknowledging Mosley, and citing to the practice of other jurisdictions, we found that "[a] verdict on civil conspiracy should yield to a finding for the defendant on the underlying tort because the cause of action is wholly subordinate to the underlying tort's existence." Id. at 407.

Clearly, Boyanowski is more analogous than Mosley to the present case. Appellant in this case was entitled to a judgment as a matter of law not solely, if at all, because the verdict was internally inconsistent, as in Mosley, but rather because the verdict for tortious interference against the appellant cannot stand without appellees showing that appellant had committed a particular underlying tort, precisely what we held that Boyanowski required. That is, it is not that some element of the jury's fraud finding is legally irreconcilable with an element of the tortious interference with contractual

36

relationships verdict, but rather that the jury rejected any underlying tort claims that could have served as the basis for a subordinate tortious interference claim verdict. Thus, the verdict in this case is better characterized as reflecting conclusions that are internally incompatible rather than conclusions that are inconsistent.

Moreover, it is important to recognize that in one respect this case presents even more compelling circumstances for granting appellant a judgment as a matter of law than the circumstances did in Boyanowski, because in Boyanowski we did not suggest, as we will here, that strange as it may seem, an improper jury instruction could have cured any inconsistency problem. Here, the Court did not instruct the jury, as it should have done, that if the parties are competitors, it must find that appellant engaged in independently actionable conduct for it to find in favor of appellees on the tortious interference claim. Thus, the Court's charge allowed the jury to return a verdict for appellees on the tortious interference claim without making a finding that appellant engaged in independently actionable conduct, a conclusion that the jury rejected.[15] Therefore,

_____

[15]The error in the charge does not require a remand, because it would be pointless; inasmuch as the jury already has determined that there was not an independently actionable tort and appellees do not challenge that verdict, that verdict must stand. We certainly are not going to remand the case for a new trial to give the appellees a chance to prove in the context of and as an element of a tortious interference claim that appellant engaged in independently actionable tortious conduct after appellees were unable to prove that claim on a free standing

regardless of the Pennsylvania rule on justification in tortious interference claim cases, under the law as the District Court explained it to the jury, there was no inconsistency in the jury's verdict.[16]

We have not overlooked appellees' attempt to support the verdict on the tortious interference claim by relying on the jury's rejection of appellant's counterclaim for breach of contract. In this regard, appellees contend that the verdict establishes that appellant did not lawfully possess Acumed's inventory. We recognize that it certainly is true that if the jury had accepted as accurate appellant's version of the contract between Acumed and Advanced, then appellant would have had a valid reason to retain the Acumed inventory. However, the jury's verdict against appellant on its breach of contract counterclaim does not prove the contrapositive: that appellant did not legitimately possess Acumed inventory after the termination of the Advanced-Acumed Agreement. Indeed, as noted above, the jury specifically rejected appellees' conversion claim based on appellant's failure to return its Acumed inventory. Thus, though

---

basis.

[16]We find it ironic that, with the benefit of hindsight, we can see how appellees might have pleaded themselves out of the tortious interference claim verdict. They may have done so because while appellees were required to establish that appellant was not privileged or justified in making its sales by showing that appellant employed wrongful means in doing so through actionable conduct, we do not see why appellees had to plead a separate cause of action requiring its own verdict to establish that aspect of the tortious interference claim count.

38

they make the conclusory assertion that appellants acquired their Acumed products through "illegitimate means," appellees' br. at 18, appellees do not demonstrate that appellant engaged in independently actionable conduct in its acquisition or retention of Acumed products. Accordingly, appellees' reliance on the jury's rejection of appellant's breach of contract counterclaim as a basis to uphold their tortious interference claim verdict is unavailing.[17]

Appellees assert that even if appellant acquired the products legitimately, appellant was aware of the customs and practices of the surgical supplies industry, which include an expectation that hospitals and surgeons will purchase surgical products and tools from authorized dealers. Consequently, appellees contend that appellant should not have made the 25 Acumed sales from its inventory after it no longer was an Acumed authorized representative. While appellant may not have honored the "customs and practices" of the industry, that conduct, in and of itself, does not violate any principle of

---

[17]Though our determination that appellant's actions were within the bounds of competitive privilege eliminates the need to examine any damages element of that claim, we note that appellant's legitimate acquisition of the Acumed goods it sold after 2001 further undermines the claim that appellant interfered with Acumed's prospective sales. Under Pennsylvania law, proof of "actual legal damages" is necessary to establish tortious interference with prospective contractual relationships. Brokerage Concepts, 140 F.3d at 530. If appellant purchased its Acumed goods in a fair and lawful fashion, Acumed cannot establish that it suffered such damages on account of lost profits.

39

statutory or common law of which we are aware that imposes liability on it for its actions.

Likewise, appellees' argument that appellant knew it would be displacing Surgical in making potential sales is not independently actionable. To the contrary, the Restatement encourages a stranger to a relationship to engage in such conduct:

> One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor.

Restatement (Second) of Torts § 768 cmt. b (1979).

In the absence of some evidence that appellant engaged in independently actionable conduct, it is shielded from liability by the competition privilege, and thus the verdict on the tortious interference claim against it cannot stand. Therefore, viewing the evidence in the light most favorable to appellees, and even acknowledging that the evidence could support the verdict, we find that the District Court erred in not granting appellant's motion for judgment as a matter of law on appellees' tortious interference with existing or prospective contractual relationships claim. Our disposition of this claim requires that we reverse the judgment for both the compensatory and punitive

40

damages predicated on it as well.[18]

[18]We realize that even though appellant filed its motion for a judgment as a matter of law under Fed. R. Civ. P. 50(b), it did not move for a judgment as a matter of law or a directed verdict in its favor on the tortious interference with contractual relationships claim against it on the basis on which we are reversing prior to the end of the trial and the discharge of the jury. It therefore might be thought that under our jurisprudence we "cannot reverse the district court's decision denying [appellant's] Rule 50(b) motion." Simmons v. City of Philadelphia, 947 F.2d 1042, 1077 (3d Cir. 1991). See also Abraham v. Pekarski, 728 F.2d 167 172 (3d Cir. 1984) ("[A] Rule 50(b) motion for judgment notwithstanding the verdict may not be made on grounds that were not asserted in a motion for directed verdict."). Moreover, in Mosley we commented that

> the inappropriateness of entering judgment as a matter of law solely on the basis of inconsistent verdicts is evident [because a] motion for judgment as a matter of law rendered after trial must be made on grounds that were previously asserted in a motion for directed verdict prior to submission of the case to the jury [and o]bviously the inconsistency of the verdicts could not have been raised in a motion for directed verdict prior to jury deliberations.

102 F.3d at 90 (internal citations omitted).

Nevertheless there are several reasons why the foregoing

41

jurisprudence does not preclude us from reversing the judgment predicated on the jury verdict against appellant on the tortious interference claim. First, appellees do not make the possible procedural argument we mention now. Second, as we explained in Greenleaf v. Garlock, Inc., 174 F.3d 352, 364 (3d Cir. 1999), the Rule 50(b) requirement for an underlying motion for a judgment as a matter of law or a directed verdict is applicable when the post-trial Rule 50(b) movant asserts "that there is insufficient evidence to support the verdict." Here, there was ample evidence to support the tortious interference claim verdict. Appellees' problem is that the jury rejected the evidence, so that while appellees obtained a partially favorable verdict, it was as a matter of law internally incompatible. Third, in Boyanowski, though not citing Rule 50(b), we effectively granted a Rule 50(b) judgment when we held that the failure of the underlying tort claim "sufficed as a matter of law to vitiate the finding of civil conspiracy . . . ." Boyanowski, 215 F.3d at 406. Accordingly, we reversed the judgment and set aside the verdict on the basis of the internal incompatibility of the verdict even though the appellants did not and could not raise the incompatibility point prior to the verdict. Fourth, the law must afford appellant some means to challenge the verdict after its return when an earlier challenge would have been impossible. Cf. Surrick v. Killon, 449 F.3d 520, 531 (3d Cir. 2006) (federal courts have "inherent authority" to manage and conduct cases before them). Thus, regardless of how we characterize appellant's Rule 50(b) motion, substantively we must consider it, for we will not hold that a party aggrieved by an outcome of a trial cannot challenge an order where the rules of court at no time provided a procedure for the challenge. The situation here

42

Finally, on this competition point we observe that our opinion does not preclude Acumed from protecting the market for its products. Quite the contrary is true, for Acumed was free to notify Pennsylvania and New Jersey hospitals and surgeons that Surgical was its exclusive representative and urge potential customers not to buy any Acumed products from unauthorized dealers. In fact, it took that step when it sent letter notifications to its customers advising them to deal with its authorized representative.[19]

In a manner in harmony with the verdict, the District Court in its May 21, 2007 order, at appellees' request enjoined appellant from selling its remaining inventory of Acumed products. Of course, for a court to grant an injunction, it is "essential that the activity sought to be restrained is actionable." Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d

is completely different than one in which a litigant lost its right to raise an issue by not doing so at the appropriate time or does not have the right to raise an issue because an attempt to do so would be premature.

[19]Appellant raises contentions about the form of the verdict on the tortious interference claim, challenges the District Court's action in instructing the jury to deliberate further on the tortious interference claim after it returned its initial verdict, and raises various theories for seeking a reversal of the judgment for punitive damages. We, however, do not address these contentions, as they are moot.

1277, 1283 (Pa. 1992) (quotations and citation omitted). In view of our result, it necessarily follows that because appellant's sale of Acumed products was not actionable, the injunction against it cannot stand. Accordingly, we will reverse the District Court's order granting the injunction prohibiting appellant from selling Acumed products.[20]

B. The Best Evidence Rule

Appellant challenges several of the District Court's evidentiary rulings.[21] First, appellant argues that the District

[20]In our disposition of appellees' claim of tortious interference with their existing or prospective contractual relationships, we have referred to Advanced and Morris singularly as appellant even though appellant in its brief contends that the District Court erred in joining them on the verdict slip on this tort and that the Court should not have joined them with respect to punitive damages, "since punitive damages should be assessed against each defendant individually." Appellant's br. at 41. Though appellant probably is correct in this contention, see supra note 9, so that it might follow from the foregoing argument that we should not have joined Advanced and Morris as a single appellant on the appeal with respect to the tortious interference claim, obviously we have not prejudiced either Advanced or Morris by our joinder of them, as both have been completely successful on this appeal with respect to the tortious interference claim and punitive damages.

[21]These contentions are not rendered moot by reason of our reversal of the judgment against appellant because we are affirming the negative disposition on appellant's counterclaims

44

Court erred in excluding certain evidence on the basis of Fed. R. Evid. 1001-1002, the best evidence rule. Rule 1002 requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." The District Court applied Rule 1002 to bar Morris's testimony regarding "buy-out" clauses in contracts appellant had with other medical devices manufacturers and suppliers because Morris did not produce the contracts at trial. Morris sought to testify to the contents of the contracts to prove that he requested and secured a buy-out clause from Acumed, a contention which appellees disputed. Obviously, this point is important to appellant because one aspect of its counterclaim was that Acumed failed to pay appellant a sum due to it as a buy-out payment.

Appellant argues that because the contracts with other suppliers were not at issue in this litigation, the District Court erred in barring Morris's testimony under Rule 1002. Though appellant certainly did not seek to recover on contracts it had with manufacturers other than Acumed, we nevertheless disagree with appellant's contention that the contracts with those manufacturers were not at issue in this litigation. It has been explained that:

> [E]ven where the substantive law does not make the contents of a writing, recording, or photograph a primary issue, evidence of those contents may still be relevant. This is true where pertinent

and the evidence excluded could have affected that outcome.

45

> events occurred independent of a writing, recording, or photograph but are nonetheless evidenced by the contents of such an item. Rule 1002 applies if evidence of those contents is offered.

31 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 7184, at 388 (2008).

The best evidence rule clearly applied to Morris's testimony regarding buy-out clauses contained in appellant's contracts with other manufacturers and suppliers, as the clauses would have been relevant in this litigation only if they tended to support Morris's testimony that appellant insisted on a buy-out clause in all of its representation contracts and thus did so in its contract with Acumed. Therefore, inasmuch as the best evidence rule applied, the District Court did not abuse its discretion in barring Morris's testimony regarding the contents of contracts not submitted into evidence or even produced for review at the trial.[22]

Similarly, appellant's argument that the District Court erroneously allowed appellees to introduce speculative

---

[22]In fact, we question whether evidence of appellant's buy-out clauses in other contracts could be relevant evidence of the contents of the Advanced-Acumed Agreement, but in view of the jury verdict and rejection of the buy-out clause evidence on the basis of the best evidence rule, we will assume without deciding that the evidence if satisfying the best evidence rule would have been admissible.

testimony regarding appellant's contracts is meritless. Appellant asserts that the testimony of several witnesses was "ill-founded," based on "hunches," and "hearsay." Appellant's br. at 57. Appellant, however, does not point to any part of the record where a witness for appellees improperly testified to the contents of appellant's contracts with its manufacturers and suppliers. After a review of the very extensive record, we find that the testimony of witnesses to which appellant objects was both competent and relevant. Therefore, the District Court did not abuse its discretion in allowing the testimony of appellees' witnesses with respect to these contracts.

C. Summary Judgment Procedure

Appellant challenges the District Court's March 6, 2007 summary judgment order dismissing the institution of groundless litigation, defamation, and unlawful restraint of trade portions of counterclaim IV. It argues that the District Court did not follow the procedural requirements required for the granting of summary judgment inasmuch as it directed the parties to submit letter briefs in lieu of formal summary judgment motions, which it did not permit. In appellant's view, the letter briefs, even when combined with subsequent oral argument, did not provide it with a full and fair opportunity to support its claims before the District Court granted summary judgment rejecting its claims.

Appellant asserts that the District Court, during a telephone conference on February 6, 2007, requested that the parties file letter briefs on any issue they wished to raise in dispositive motions. According to appellant, the District Court

stated in the telephone conference that "if a party wanted to file a dispositive motion, it could file a five page letter brief . . . outlining what the motion would cover."[23] Appellant's br. at 59. The parties served their briefs on February 22, 2007, and the Court held oral arguments on the briefs the next day. Appellant contends that because the Court held the oral arguments on the day after parties served their letter briefs, it did not have an opportunity to respond to appellees' arguments. Moreover, appellant, believing that the letter briefs were only "pre-motions," a term that the Court itself used and seemingly created, asserts that it was taken by surprise when the Court granted summary judgment for appellees dismissing portions of counterclaim IV.

In reviewing appellant's summary judgment procedure contentions, we start with the principle that "[i]t has long been established that, under the right circumstances, district courts are entitled to enter summary judgment <u>sua sponte</u>." <u>Gibson v. Mayor & Council of Wilmington</u>, 355 F.3d 215, 222 (3d Cir. 2004). A court, however, must provide the parties with notice of its intention to consider granting summary judgment so that they have an opportunity to marshal evidence on the motion for submission to the court. <u>See</u> <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 913 F.2d 1064, 1069-70 (3d Cir. 1990). Our review of the parties' letter briefs leads us to conclude that the parties treated

_____

[23]The transcript, if there is one, of the telephone conference is not included in the record on appeal. The Court, however, on February 6, 2007, signed an order memoralizing certain of the determinations it made during the telephone conference call, though the order did not mention filing briefs.

48

the "pre-motions" as an opportunity to marshal evidence and make arguments with respect to granting or denying summary judgment. In fact, contrary to what appellant argues now, while the case was pending in the District Court it surely had that view, for it used the last paragraph of its February 22, 2007 letter brief to request summary judgment in its favor on its counterclaim for conversion. We have held that a party has sufficient notice before a summary judgment is entered against it if it had reason to believe that the court might reach the matter at issue on the pending summary judgment application and the party had an opportunity to support its position fully. See Gibson, 355 F.3d at 223-24. Inasmuch as appellant requested partial summary judgment in its letter brief, arguably it should have recognized that appellees in their letter brief could request summary judgment dismissing the counterclaims.

It is entirely appropriate for courts to recognize a procedure allowing them to grant summary judgment on their own initiative, for courts' resources are limited and they should not be required to use those resources to conduct an unnecessary trial merely because a party entitled to a summary judgment in whole or in part does not seek that outcome to litigation. Yet we have been clear that "the sua sponte grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims." Gibson, 355 F.3d at 224. Moreover, as we emphasized in Bradley, it is important that before a court grants summary judgment on its own initiative it give notice to the parties that it is considering doing so and that it give the parties the opportunity to marshal evidence and make arguments on whether the court should grant summary judgment. We think that in this case it is doubtful that the

49

District Court gave the parties adequate opportunity to present evidence or make arguments with respect to granting summary judgment, though, as we now will explain, it is clear that even if the Court made an error in the summary judgment procedure, the error was harmless.

In making a harmless error analysis we point out that appellant filed its brief on this appeal using materials bearing on the issues raised on this appeal that were not part of the record, but has sought to expand the record to include these materials. Nevertheless, as we further explain below, even if we considered for use on the merits the materials appellant seeks to add to the record, we would affirm the District Court's order to the extent that it granted summary judgment against appellant on portions of its counterclaim. Appellant's brief makes clear that it predicates its objection to the grant of summary judgment on "Advanced [being] denied a <u>full</u> and <u>fair</u> opportunity to defend its claims, in violation of its rights to due process." Appellant's br. at 61 (emphasis in original). It thus follows that if upon exercising plenary review, as we are on appellant's appeal from the granting of summary judgment against it, we would affirm the District Court's order to the extent that it granted summary judgment against appellant on its counterclaim even considering all of the materials with which appellant seeks to supplement the record and has placed in the appendix, then the procedure in the District Court could not have been prejudicial to appellant.

Furthermore, there is an even more fundamental reason why the error, if there was one in the summary judgment procedure, was harmless, namely that for the reasons we set forth with respect to summary judgment, appellant's

counterclaim to the extent that the Court granted summary judgment dismissing it, did not state a claim upon which relief could be granted and thus was subject to dismissal under Fed. R. Civ. P. 12(b)(6). In this regard we point out that in appellees' reply to appellant's answer and counterclaim they asserted a Rule 12(b)(6) defense and this defense remained open during the disposition of the case in the District Court. The unmistakeable conclusion that must be drawn from the facts as appellant alleges them in its counterclaim and the applicable law is that appellant could not recover on the counterclaim to the extent that the Court granted summary judgment against it. Thus, the Court's possible procedural error in granting summary judgment was harmless. See Bradley, 913 F.2d at 1069-70.

D. The Merits of Counterclaim IV

Appellant asserts that the District Court erred in granting summary judgment and dismissing counterclaim IV to the extent that it did. We reject this contention as we agree with appellees that counterclaim IV is a "mish-mash of multiple claims," appellees' br. at 57, some of which appellant did not present properly to the District Court and none of which is meritorious.

Appellant makes the following arguments under the rubric of counterclaim IV: (1) appellees instituted the Lanham Act claim in order to "manufacture federal jurisdiction" as well as to tortiously interfere with appellant's contracts with other medical suppliers; (2) during the litigation, appellees used depositions to impugn appellant's reputation and to injure appellant's relations with other medical products suppliers,

51

actions constituting abuse of process, defamation, tortious interference with contract, and unfair competition; (3) the District Court erred in denying appellant's request to enter certain witnesses' statements into evidence, thus crippling appellant's tortious interference with contract claim; and (4) appellees' conduct during the Nazareth Hospital incident led to Morris's banishment from the Jefferson Hospital surgery operating theater and Acumed's action in sending the letters to customers with respect to its representative constituted tortious interference with appellant's contractual relationships and unfair competition.  The District Court dismissed all of these claims, either on summary judgment or by granting judgment as a matter of law at the conclusion of the trial.

As we indicated above, in considering appellant's arguments on this appeal, we have taken into account appellant's motion to supplement the record with various documents not in the District Court record but in the appendix and, even though we have not granted that motion, we nevertheless have considered that evidence.[24]  We have taken

---

[24]Appellant's motion to supplement the appendix explains that it wants to add "additional documents relevant and material to the issues on appeal" from various orders, including the "order granting partial summary judgment."  It attempted to justify the motion with the contention that the "additional documents were not already part of the record because they were not necessary on the trial level but rather are relevant and material to issues raised on appeal."  We reject that flawed approach, as an appellant should raise its issues in the district court in the first instance.

that step notwithstanding our practice of generally not reviewing evidence or issues that a party did not present to the District Court. See Appalachian States Low-Level Radioactive Waste Comm'n v. Pena, 126 F.3d 193, 196 (3d Cir. 1997); see also Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 524 n.6 (3d Cir. 1999) (holding that the appellant waived an equitable subrogation argument on appeal because, "[a]lthough [appellant] claims that it made this argument in its brief opposing Gulf Coast's motion for summary judgment . . .[,] our review of that brief convinces us that this argument was not fairly raised"); United States v. Genser, 582 F.2d 292, 311 (3d Cir. 1978) (evidence not presented to district court may not be considered by court of appeals). Thus, even though we recognize that as a practical matter our disposition of the motion to expand the record cannot matter, we will consider that motion as well as an earlier motion appellees filed to strike all material outside of the District Court record.

1.  The record on appeal

        The first indication to us that there was a problem with the record on the appeal came when, after appellant filed its brief and appendix, appellees filed a motion requesting that we strike all material outside of the District Court record from the appendix. Only then, in response, did appellant file a motion to include in the record on appeal additional documents that it considered to be relevant and material to the issues on appeal that were not part of the District Court record. We grant appellees' motion and deny appellant's motion.

        Fed. R. App. P. 30(a)(1) provides that the contents of the

53

appendix include: (1) the relevant docket entries in the district court proceeding; (2) the relevant portions of the pleadings, charge, findings, or opinion; (3) the judgment, order, or decision in question; and (4) other parts of the record to which the parties wish to direct the court's attention. The record, in turn, consists of: (1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings; and (3) a certified copy of the docket entries prepared by the district clerk. Fed. R. App. P. 10(a).

It is established that although "[t]he only proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court," Fassett v. Delta Kappa Epsilon, 807 F.2d 1150, 1165 (3d Cir. 1986), in exceptional circumstances a court of appeals may allow a party to supplement the record on appeal. We listed what these circumstances might be in In re Capital Cities/ABC Inc.'s Application for Access to Sealed Transcripts, 913 F.2d 89, 97 (3d Cir. 1990) (citing Ross v. Kemp, 785 F.2d 1467, 1475 (11th Cir. 1986)), as follows:

> (1) whether the proffered addition would establish beyond any doubt the proper resolution of the pending issue; (2) whether remanding the case to the district court for consideration of the additional material would be contrary to the interests of justice and the efficient use of judicial resources; and (3) whether the appeal arose in the

context of a <u>habeas</u> <u>corpus</u> action.[25]

None of the circumstances we listed in <u>Capital</u> <u>Cities</u> is present in this case.  Here, the documents that appellant wishes to submit for our consideration do not establish beyond doubt, or indeed even under the less demanding showing that a party must make in opposing summary judgment, that the District Court's rulings on its summary judgment disposition were incorrect.  Thus, taking into account the record as appellant wishes it to be, we would affirm the order for summary judgment.[26]   Therefore, in considering the appeal from the

---

[25]Of course, sometimes a case becomes moot on appeal by reason of circumstances arising after the completion of a case in a district court.  Such circumstances can and should be brought to the attention of the court of appeals.

[26]In this regard, we point out that our review on an appeal from the granting of a summary judgment is plenary and that a court should not grant a summary judgment if there is a genuine issue as to a material fact.  It therefore follows that, if the materials with which an appellant against whom a district court has granted summary judgment seeks to expand the record on appeal would have precluded the court from granting the summary judgment had they been presented to it, the appellant necessarily has satisfied the beyond doubt standard for expanding the record on appeal.  Nevertheless, we do not intend by this opinion to set a precedent that a litigant can withhold materials from a district court or not obtain all materials that it could obtain on a summary judgment motion and then submit them on appeal.  Quite to the contrary, a party should present

summary judgment on the merits, we deny appellant's motion to expand the record and grant appellees' motion to strike material outside the record. Accordingly, though perhaps our limitation of the record may be regarded as a legal fiction inasmuch as we have considered the record as though it has been expanded, we only will consider materials that were part of the record before the District Court.[27]

---

everything it needs for a complete presentation on the motion and, if necessary, seek additional time under Fed. R. Civ. P. 56(f) to marshal its evidence. We, however, are considering the materials on the appeal beyond the record in part because the procedure in the District Court in this case though, as we have explained, ultimately permitting appellant to present all of its material nevertheless was irregular.

[27]We believe that the parties should be able to agree on the documents to be stricken, as there seems to be little dispute as to what the record was before the District Court. But it does not matter if they cannot do so, for, as we have indicated, even considering the totality of appellant's submissions with respect to the summary judgment, we would uphold it. Thus, the inclusion of the documents that appellant seeks to add would not change our result. We do note that to the extent that it appears that the parties presented the deposition of Dr. Robert Frederick to the District Court during the summary judgment proceedings, that deposition properly is included in the appendix. In any event, regardless of what happened in the District Court, we think that it is particularly appropriate that we consider Dr. Frederick's deposition because notwithstanding appellees' contention that his deposition, along with numerous other items,

2.  Instituting Groundless Litigation, Defamation and Unfair Competition[28]

Under Pennsylvania law, a plaintiff bringing a defamation action must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.  42 Pa. Cons. Stat. Ann. § 8343 (West 1998).

Appellant relies on Restatement (Third) of Unfair Competition § 1 to support its unfair competition allegation but does not cite any state-court appellate decision that has adopted section 1 in Pennsylvania.  Nevertheless, inasmuch as we reject appellant's section 1 contentions, we will assume without deciding that Pennsylvania courts would follow that section.[29]

---

was not "part of the district court record" and was "improperly included in the Appellants' Appendix," in appellees' brief they cite and rely on that deposition.  We do not think that the appellees can have Dr. Frederick's deposition treated in opposite ways.

[28]In its March 6, 2007 summary judgment order, the District Court referred to "unfair competition" as "unlawful restraint of trade."

[29]Several district courts and Pennsylvania state trial courts have recognized a cause of action for unfair competition under

57

Section 1 states, in relevant part, that:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:
>
> (a) the harm results from . . . acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or
>
> (b) the acts or practices of the actor are actionable by the other under federal or state statutes . . . or general principles of common law apart from those considered in this Restatement.

Appellant maintains that in the incident in December 2004 that we already have described, a Surgical sales representative "loudly accused" Advanced's sales representative of illegally selling Acumed products at Nazareth Hospital. According to appellant, the Nazareth Hospital incident led Dr. Robert Frederick, a Nazareth doctor, to stop doing business with appellant and also resulted in Morris's exclusion from the

certain circumstances.  See ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F. Supp. 2d 622, 687 (E.D. Pa. 2003) (listing cases).

58

operating theater at Jefferson Hospital. Dr. Frederick, however, at a deposition on January 31, 2007, denied overhearing the argument between the two sales representatives and had no recollection of refusing to do business with appellant. Moreover, appellant did not present evidence that a Surgical sales representative made defamatory statements about appellant's Acumed inventory and does not point to evidence connecting Morris's exclusion from the Jefferson Hospital operating theater to the Nazareth Hospital incident. Therefore, the District Court properly dismissed this claim on summary judgment. See Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 332-33 (3d Cir. 2005) (speculation and conjecture may not defeat a motion for summary judgment).

Further, the letters Acumed sent to appellant's customers, despite appellant's view that they "disparage[d] the inventory Advanced was selling," appellant's br. at 18, do not qualify as defamation or unfair competition. The letters informed Acumed's customers—without mentioning appellant by name—that Acumed only would insure and warrant products its authorized dealers sold and further informed its customers that Surgical was its authorized representative in eastern Pennsylvania and southern New Jersey. Thus, inasmuch as the letters did not specifically name appellant and were not defamatory under Pennsylvania law, the District Court appropriately granted appellees summary judgment on this claim. Likewise, because Acumed's conduct in sending the letters was not actionable but rather was justified, the letters did not constitute unfair competition.

Appellant argues that certain questions that appellees'

59

counsel asked witnesses during depositions constituted an abuse of process.  To the extent that appellant did not raise these claims in the District Court, it waived them.  Arnold M. Diamond, 180 F.3d at 524 n.6.  In any event, appellees in asking the questions did not engage in conduct constituting an abuse of process.[30]

Finally, appellant contends that Acumed pleaded a Lanham Act claim in order to "manufacture federal jurisdiction."[31]     Appellees' Lanham Act claim survived appellant's pretrial motion seeking an order dismissing the case for want of federal jurisdiction, but the jury rejected the Lanham Act claim at trial.  We believe that in alleging that appellees instituted groundless litigation, appellant was attempting to bring a malicious prosecution claim under Pennsylvania law and, in any event, we see no other way to treat the claim.  In Pennsylvania, a party engages in malicious prosecution when it institutes a lawsuit with a malicious motive and without probable cause.  Werner v. Plater-Zyberk, 799 A.2d 776, 785

---

[30]Our disposition of this issue makes it unnecessary to examine the litigation privilege on the point.

[31]We note, however, that appellant does not appear to have pleaded properly in a counterclaim that appellees instituted groundless litigation.  Inasmuch as the District Court did not issue an opinion on its summary judgment disposition, we are not certain whether it dismissed this portion of the counterclaim because appellant improperly  pleaded it or because of its lack of merit.  We, however, are upholding the dismissal of the claim on the merits.

60

(Pa. Super. Ct. 2002). Based on the Nazareth Hospital incident and other reports that unauthorized sales representatives were selling its products, Acumed had cause to believe, even though the jury's verdict did not support that belief, that appellant was causing confusion in the marketplace with regard to appellant's relationship with Acumed. Therefore, the District Court did not err in granting summary judgment on appellant's claim that appellees instituted groundless litigation against it.[32]

3. Tortious Interference with Contractual Relationships

We already have discussed Pennsylvania's requirements for a tortious interference with contractual relationships claim when considering appellant's appeal from the judgment in favor of appellees on their similar claim, and thus we do not repeat them here. We find that the District Court did not err in granting appellees a judgment as a matter of law on this portion of counterclaim IV, inasmuch as appellant did not present any evidence of conduct that could have led a reasonable jury to conclude that appellees interfered with appellant's contracts.

Appellant based its tortious interference counterclaim on the same incidents that it alleges constituted defamation: the Nazareth Hospital incident and Acumed's letters to its customers. To the extent that appellant claims that Acumed's

---

[32]Appellees contend that appellant could not bring its malicious prosecution counterclaim in the very action appellant claimed was being maliciously prosecuted. See T.C.R. Realty, Inc. v. Cox, 372 A.2d 721, 728 (Pa. 1977). We need not address this point.

letters constituted tortious interference, these claims are meritless as a matter of law. As we discussed above, the letters do not even mention appellant, and Acumed certainly had a right, if not an obligation, to notify the purchasers of its products of its warranty policies. Further, there was no evidence at the trial that Casey or anyone else representing appellees made false statements or misrepresentations to third parties during the Nazareth hospital incident. Finally, appellant challenges the exclusion of the testimony of Jeanne Mikalauskas, one of its sales representatives, arguing that her testimony would have supported appellant's version of the Nazareth incident. The District Court, however, properly excluded Mikalauskas' testimony, as she was not present during the incident and attempted to testify to out-of-court statements of Dr. Frederick precluded by the hearsay rule. See Fed. R. Evid. 802.

E. Attorneys' Fees

After the jury's verdict, appellant filed two motions for attorneys' fees. First, appellant sought to recover attorneys' fees from appellees based on the non-disclosure provision of the RMW Agreement, as appellant believed that appellees contended that the non-disclosure provision had been included in the Advanced-Acumed Agreement. The RMW Agreement non-disclosure provision recited that "[i]f any action at law or inequity [sic] is brought to enforce or interpret the provisions of this Agreement, the prevailing party in such action shall be entitled to reasonable attorney's fees." App. at 3534. Appellant reasons that because appellees unsuccessfully sued it for breach of the non-disclosure agreement from the RMW Agreement Acumed contended was incorporated in the Advanced-Acumed

Agreement, appellant is entitled to attorneys' fees as the prevailing party on that aspect of the case.[33] The District Court rejected this claim based on its conclusion that inasmuch as throughout the trial appellant denied that the terms of the RMW Agreement governed its relationship with Acumed, appellant could not be entitled to attorneys' fees because it was not a party to the agreement. Appellant argues that the District Court misunderstood its claim: it was not suing under the RMW Agreement but rather was suing under an agreement between it and Acumed that Acumed claimed at trial was identical to the RMW Agreement.

It appears that even though Acumed predicated its breach of contract claim on a non-disclosure agreement, it did not introduce physical evidence of an agreement between the parties to this case and did not allege in its pleadings that the RMW Agreement and the Advanced-Acumed Agreement were identical.[34] The existence of an attorneys' fees provision was not at issue during the trial. Therefore, we cannot know from Acumed's allegations and evidence whether any non-disclosure agreement it might have had with appellant contained an attorneys' fees provision. On the other hand, appellant

_____

[33]Appellees argued that appellant was prohibited from using Acumed's confidential information for its own benefit and thus appellant breached the non-disclosure agreement by selling Acumed products after their contractual relationship ended.

[34] Kelly Packard, the Vice President of Sales and Marketing for Acumed, however, testified that the agreement between appellant and Acumed was "the same as what our RMW did." App. at 1384.

introduced evidence of an unsigned written contract that it contended set out the terms of the contract between Advanced and Acumed but did not contain a non-disclosure agreement. In the end, the jury rejected both parties' breach of contract claims. We think that it is anomalous for appellant to move for the enforcement of an attorneys' fees provision which: (1) was unquestionably not included in the version of the agreement that it insisted governed its relationship with Acumed, and (2) may or may not have been in Acumed's version of the agreement.

Appellant predicated its second claim for attorneys' fees under the Lanham Act, which authorizes an award of attorneys' fees to a prevailing party in "exceptional" cases. 15 U.S.C. § 1117(a). Exceptional cases involve culpable conduct on the part of the losing party, "such as bad faith, fraud, malice, or knowing infringement." Securacomm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 280 (3d Cir. 2000) (citation omitted). "In cases in which the defendant is the prevailing party in a trademark infringement case and seeks fees from the plaintiff, the plaintiff's culpable conduct will necessarily center on the act of filing the lawsuit rather than on the infringement." Id. We think that notwithstanding the jury's verdict, there was a foundation for appellees' argument that appellant was liable to them under the Lanham Act, and we therefore decline to hold that appellees acted in bad faith or with malice when they filed the Lanham Act aspect of their action. Accordingly, the District Court did not abuse its discretion in denying attorneys' fees under the Lanham Act.

F. Contempt Order

The District Court entered an order holding appellant in contempt of court for violating the Court's March 21, 2007 order requiring appellant by the following day to present documents related to its net worth. When appellant failed to produce all of the required documents, the Court ordered it to pay appellees' attorneys a fee of $1350, allowed appellees access to appellant's hard drive, and allowed appellees to cross-examine Morris in front of the jury regarding the missing documents.

Appellant argues that the District Court should not have entered the contempt of court order because the Court previously had denied appellant's request for access to appellees' financial records, stating that it would deal with the issue after the trial was over. Appellant also contends that the District Court set an unreasonably short time for it to produce the documents.

Appellant, however, was on notice when appellees served subpoenas on Advanced and Morris on March 12, 2007, and March 16, 2007, requiring them to produce financial records. Moreover, as the District Court reasoned, the parties knew that the net worth issue could be litigated and presented to the jury at the end of the liability aspects of the trial because both sides asked for punitive damages. In these circumstances, the District Court did not abuse its discretion in finding appellant in contempt of court for non-compliance with the March 21, 2007 order.[35] See Armstrong v. Guccione, 470 F.3d 89, 101-02 (2d

---

[35]Appellant's argument that it made a good faith effort to comply with the District Court's order is not a defense to civil

Cir. 2006) (quoting Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535 (1966)) ("There can be no question that courts have inherent power to enforce compliance with their lawful order through civil contempt.").

## V. CONCLUSION

For the foregoing reasons, we conclude that the District Court erred in denying appellant's motion for judgment as a matter of law on the tortious interference with contractual relationships claim. We therefore will reverse the District Court's order of May 21, 2007, to the extent that it denied appellant a judgment as a matter of law on the tortious interference claim, and will remand the case to the District Court for it to enter judgment as a matter of law in favor of appellant on that claim and to set aside the prior judgment on the claim. As a result, we also will reverse the jury's award of compensatory and punitive damages against appellant and the District Court's grant of an injunction in appellees' favor. We will affirm all of the District Court's other orders from which appellant has appealed, including the Court's orders on attorneys' fees, summary judgment, judgment as a matter of law on appellant's counterclaims, and evidentiary issues, as well as the order of March 22, 2007, holding appellant in contempt of court. The parties will bear their own costs on this appeal.

---

contempt. See Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994).

AMBRO, Circuit Judge, concurring

I join Judge Greenberg's well-crafted and in-depth opinion.  I mention two more matters, not necessary to the outcome of this case, that I nonetheless deem of concern.

The jury's initial compensatory award to Acumed of $0 reflected the conclusion, mentioned in note 17 of Judge Greenberg's opinion, that Acumed cannot prove the "actual legal damage" necessary to establish tortious interference with contractual relationships.  Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998).  By denying Acumed compensatory damages, the jury indicated that Acumed had not shown "the loss of the benefits of the contract or prospective relation[,] or consequential, emotional or reputational losses[,] resulting from the defendant's conduct" required to satisfy Pennsylvania's description of tortious interference with existing or prospective contractual relations. Pawlowski v. Smorto, 588 A.2d 36, 40 (Pa. Super. Ct. 1991) (applying and interpreting § 774A of the Restatement (Second) of Torts); see also Birl v. Phila. Elec. Co., 167 A.2d 472, 474 (Pa. 1960).  Accordingly, even if the District Court had been correct in determining that Acumed had satisfied the other elements of the tort, it should have granted appellant judgment as a matter of law on the basis of Acumed's failure to establish actual damages.  See Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 325 F.2d 2, 22 (3d Cir. 1963); 21 Stuart M. Speiser, *et al*., The American Law of Torts § 31:94 (1992).

67

In addition, assuming that Acumed had somehow proven the necessary elements of tortious interference with contractual relations (which, as noted, it could not if the harm to it was nil), the District Court should not have instructed the jury to award Acumed $1 in nominal damages. The Court justified this instruction under Fed. R. Civ. P. 49(b) and <u>Wilks v. Reyes</u>, 5 F.3d 412, 415–16 (9th Cir. 1993), as a measure needed to resolve the "apparent inconsistency" between the jury's $0 compensatory award and $100,000 punitive award to Acumed. <u>Acumed LLC v. Advanced Surgical Serv., Inc.</u>, No. 05-2711, 2007 WL 1500051, at *2–3 (E.D. Pa. May 18, 2007). This does not work.

First, I believe that Pennsylvania law does not permit nominal damages for tortious interference violations. Section 907 of the Restatement (Second) of Torts defines nominal damages as "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." Pennsylvania courts have interpreted this definition to permit nominal damages only in tort cases "where harm is not a requisite to the cause of action." <u>Carter v. The May Dep't Store Co.</u>, 853 A.2d 1037, 1041 (Pa. Super. Ct. 2004). But, as stated, harm is a required element of tortious interference with existing or prospective contractual relationships. <u>See</u> <u>Pawlowski</u>, 558 A.2d at 40; <u>Pelagatti v. Cohen</u>, 536, A.2d 1337, 1343 (Pa. Super. Ct. 1987), <u>appeal</u>

68

<u>denied</u> 548 A.2d 256 (Pa. 1988).[36]

Second, even if an award of nominal damages were permitted, the District Court should not have done so here. As discussed in Judge Greenberg's opinion, the trial court could have taken a number of approaches once it learned that the general verdict and jury answers were inconsistent. But regardless of its chosen approach, it was required to apply Pennsylvania law that holds "that no award for punitive damages may be made where actual damage has not been suffered." <u>Hilbert v. Roth</u>, 149 A.2d 648, 652 (Pa. 1959); <u>see also</u> <u>Smith v. Grab</u>, 705 A.2d 894, 901 (Pa. Super. Ct. 1997); <u>Sulecki v. Southeast Nat'l Bank</u>, 516 A.2d 1217, 1219 (Pa. Super. Ct. 1986). Thus, instead of resolving the inconsistent verdict by instructing an award of nominal damages, the Court should have entered a judgment vacating Acumed's punitive damages award. <u>Cf.</u> <u>Cooper Distrib. Co., Inc., v. Amana Refrigeration, Inc.</u>, 63 F.3d 262, 281–84 (3d Cir. 1995) (vacating a punitive damages award for tortious interference

---

[36] This conclusion comports with accepted tort analysis, <u>see, e.g.</u>, <u>Action House, Inc. v. Koolik</u>, 54 F.3d 1009, 1014 n.4 (2d Cir. 1995) (noting with approval the holding in <u>Kronos, Inc. v. AVX Corp.</u>, 612 N.E.2d 289, 292–94 (N.Y. 1993), that nominal damages are not allowed in tortious interference claims); 2 Dan B. Dobbs, <u>Dobbs Law of Remedies</u> §6.6(2) (2d ed. 1993). <u>But see</u> <u>Fishkin v. Susquehanna Partners, G.P.</u>, 563 F.Supp.2d 547, 590 (E.D. Pa. 2008) (awarding nominal damages on a claim of tortious interference with existing contractual relations).

where the jury found actual harm but $0 in compensatory damages).

Third, the District Court's instruction did nothing to counter the quick conclusion that the compensatory/punitive award ratio (1/100,000) here was untenable under Pennsylvania law, see Reading Radio, Inc. v. Fink, 833 A.2d 199, 214 (Pa. Super. Ct. 2003) ("[A] reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages."), and constitutional standards, see State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

In sum, the jury's initial decision not to grant Acumed a compensatory award for actual damages ends the game for it. Tortious interference with existing or prospective contractual relations cannot be found, and thus punitive damages are not available. Instructing the jury to award $1 in compensatory damages was an unfitting effort to change these results, and the compensatory/punitive award ratio it created was off the chart of reasonableness.

70