NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4051
_____

MARVIN LEVY;
STAFFORD WORLDWIDE MARKETING, INC.

v.

HANS JURGEN SCHMIDT; JARED SCHMIDT;
JORDAN SCHMIDT; SCHMIDT ALLZWECK, INC.;
REGLINS, INC.; QVC, INC.; JOHN DOES 1-10;


HANS JURGEN SCHMIDT; REGLINS, INC.,

Appellants


_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 2-08-cv-06260)
District Judge: Honorable Susan D. Wigenton
_____

Submitted Under Third Circuit LAR 34.1(a)
November 05, 2013
_____

Before: GREENAWAY, JR., VANASKIE and ROTH, Circuit Judges

(Opinion Filed: July 14, 2014)

_____

OPINION
_____

GREENAWAY, JR., Circuit Judge

Defendants-Appellants Hans Jurgen Schmidt ("Schmidt") and Reglins, Inc.

("Reglins") (collectively "Defendants-Appellants")[1] appeal the judgment of the District

Court denying a motion for a judgment as a matter of law and for a new trial. The

question before us is whether Plaintiffs-Appellees Marvin Levy ("Levy") and Stafford

Worldwide Marketing, Inc.[2] ("Stafford") (collectively "Plaintiffs-Appellees")[3] provided

the jury with a legally sufficient evidentiary basis to calculate net profits. For the reasons

provided below, we will affirm the District Court and find that the Plaintiffs-Appellees

did provide a legally sufficient evidentiary basis for calculating net profits.

## I. BACKGROUND

### A. Levy and QVC

In 1993, Levy, through his company Stafford, developed a business relationship

with QVC, a television network specializing in home shopping. (App. 96.) QVC is the

predominant television marketing company and sells products in large volume. (*Id*. at

107-08.) From 1993 through at least 2005, Levy regularly sold products that he

developed on QVC and further, developed certain products at the request of QVC that he

---

[1] Schmidt served as the President of Reglins at all relevant times. Plaintiffs-Appellees originally named Jared Schmidt, Jordan Schmidt, Schmidt Allzweck, Inc., QVC, Inc., and John Does 1-10 as Defendants in the Complaint, but they are not parties to this appeal. (App. 9-10.)
[2] Levy served as the President and sole owner of Stafford at all relevant times.
[3] Defendants-Appellants and Plaintiffs-Appellees will be referred to collectively as the "Parties."

sold directly to QVC.  (*Id*. at 96-97, 100, 103.)

All of the products Levy brought to QVC prior to 2003 were on consignment, meaning that QVC paid Levy for the products actually sold to the public, and returned any unsold products.  (*Id*. at 108-10, 263.)

**B.  The Joint Venture Agreement and Joint Venture Products**

In late 2003, Levy and Schmidt, who are brothers-in-law, orally entered into a joint venture agreement ("JV"), whereby they agreed to design, develop, market, and sell various joint venture products ("JV products") together to QVC.  (*Id*. 896.)

Under the JV, the Parties agreed to finance costs of the JV on a 50/50 basis and in turn, divide net profits between them on a 50/50 basis.  (*See id.* at 896.)  The JV owned the intellectual property of all JV products on a 50/50 basis.  (*Id.* at 153.)

While the JV sold the majority of the products it developed to QVC on consignment, it sold two products to QVC as QVC private-label products.  In 2004, QVC asked Levy to create the "Japanese style knife set" for QVC's "Techniques by Cook's Essentials" private label and Levy brought Schmidt into the deal.  (*Id*. at 110-11, 120-21.)  Around the same time, the JV also created a "guided knife set" to sell to QVC as a private label product.  Both private label knife sets utilized a patented handle developed by the JV.

QVC placed multiple purchase orders for the guided knife set, and the Japanese knife set, which included the Santoku knife.  QVC initially used Stafford as its named

3

vendor,[4] but later changed to Reglins.  (*Id*. at 111, 161-68, 819; Supp. App. at 28.)

C. **Termination of JV and The Kohaishu Knife**

After QVC changed its vendor to Reglins, Songson, the Chinese manufacturer, appointed Reglins as its "exclusive agent for all the products designed and developed by Reglins [] and Songson [], manufactured by Songson [], and/or any of their associated companies, factories and/or partners."  (Supp. App. 21.)

On November 8, 2005, QVC officials and Schmidt—without Levy—held a meeting to discuss the development of a hybrid knife, the Kohaishu knife.  E-mails between those parties containing similar discussions followed.  (*Id*. at 2-6, 13-16.)  By December 05, 2005, the development of the Kohaishu was complete, and QVC approved the product.  (*Id*. at 6.)

On November 29, 2005, Schmidt notified Levy of his intention to terminate the JV, effective January 5, 2006, agreeing nevertheless to continue splitting net profits evenly with Levy for the JV products that continued to be sold, which included, but was not limited to, the Santoku knife.  (*Id*. at 7.)

Schmidt subsequently applied for a patent for the Kohaishu knife on the effective date of the JV termination, January 5, 2006.  (*Id*. at 13.)  QVC's first purchase order for

---

[4] The "named vendor" refers to the entity with which QVC placed the purchase order, and which receives payment from QVC.  Because the JV did not have its own entity, it used either Stafford or Reglins as the named vendor in its sales to QVC, and after a sale, would do an internal accounting of the monies owed.  For example, if Reglins was the named vendor, after a sale with QVC, Reglins would pay Stafford 50% of the net profits.

4

the Kohaishu knife was placed on January 4, 2006 and was for 45,204 units. (*Id*. 819-21.) QVC began selling the Kohaishu knife as a continuation of the JV's Japanese style knife set sold in QVC's "Technique by Cook's Essential" line. (Supp. App. 9-11.)

## D. Procedural History

On December 22, 2008, Plaintiffs-Appellees filed a complaint against Defendants-Appellants alleging: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of implied covenant of good faith and fair dealing and duty of loyalty; (4) tortious interference with economic advantage; and (5) unjust enrichment.[5] (*See* Compl. ¶¶ 6-12.) Levy and Stafford claimed that Schmidt and Reglins breached the JV by failing to split the net profits of the Kohaishu knife. The Defendants-Appellants claimed that the Kohaishu knife was not subject to the JV because they were still developing the knife after the termination of the JV and therefore the Kohaishu was a new and different knife design. (*See* App. 749-50.)

Judge Susan D. Wigenton presided over a jury trial in the United States District Court for the District of New Jersey. After the Plaintiffs-Appellees presented their case, Defendants-Appellants moved for a judgment as a matter of law, claiming that Plaintiffs-Appellees failed to make a prima facie case with respect to each of their causes of action. (*Id.* at 9.) The District Court reserved ruling on the motion. Defendants-Appellants

---

[5] Plaintiffs-Appellees also brought claims for misappropriation of confidential information; trade dress infringement, common law passing off, and unprivileged imitation; and unfair competition. Ultimately, Plaintiffs-Appellees voluntarily dismissed these claims. (*Id*. at 9-10.)

5

renewed their motion at the end of the presentation of all of the evidence. The District Court sent the issues of liability and damages to the jury.

The jury found that the Kohaishu knife was part of the JV and that Defendants-Appellants breached the JV with Plaintiffs-Appellees. (*Id*. at 10.) The jury returned a verdict for Plaintiffs-Appellees, awarding them $1,562,621.50, and the District Court entered judgment against Defendants-Appellants for that amount. (*Id*. at 10.)

After the jury verdict was returned, Defendants-Appellants again filed a motion for judgment as a matter of law, or, alternatively, for a new trial or alteration of judgment, contending that Plaintiffs-Appellees failed to provide the jury with a legally sufficient evidentiary basis to calculate net profits. (*See id*. at 4.) Specifically, Defendants-Appellants contend that Plaintiffs-Appellees failed to make a prima facie case on damages because they did not produce evidence that proved costs, an essential element in the calculation of net profits. (*See id*. at 5.) Defendants-Appellants assert that as a result, "the jury award is speculative," and therefore Defendants are entitled to judgment as a matter of law or a new trial. (*Id.*)

## II. <u>JURISDICTION</u>

This District Court had jurisdiction over Plaintiffs-Appellees' claims under 28 U.S.C. § 1331 and under 28 U.S.C. § 1367(a). (*See* App. 894.) This Court has jurisdiction under 28 U.S.C. § 1291.

## III. ANALYSIS

### A. Motion for Judgment As Matter of Law

#### 1. Rule 50 Motion for Judgment As Matter of Law

We begin with Defendants-Appellants' argument that they are entitled to a judgment as a matter of law under Fed. R. Civ. P. 50 on the basis that Plaintiffs-Appellees failed to provide a legally sufficient evidentiary basis for the jury to make a finding on damages.

A grant of a judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). If a party's Rule 50(a) motion is not granted in the first instance, as was the case here, the movant may file a renewed motion no later than 28 days after the entry of judgment, and may include an alternative or joint request for a new trial under Rule 59. Fed. R. Civ. P. 50(b). Here, Defendants-Appellants filed a renewed motion, which the District Court again denied. The District Court's denial of Defendants-Appellants' renewed motion for judgment as a matter of law and motion seeking a new trial under Rule 59 are now before us. Each will be addressed in turn.

#### 2. Standard of Review

We exercise plenary review over the District Court's denial of Defendants-Appellants' motion for judgment as a matter of law, applying the same standard as the District Court and viewing the evidence in the light most favorable to Plaintiffs-

7

Appellees, the prevailing parties. *Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 211 (3d Cir. 2009). We must also be careful to avoid making make credibility determinations or weighing the evidence, as that is the province of the jury. *Id.* at 211.

This Court will reverse only if the record is "critically deficient of the minimum quantum of evidence" upon which a jury could reasonably base its verdict. *Id.* But "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (internal citations and quotation marks omitted).

For the jury to have "a legally sufficient evidentiary basis" to find for Plaintiffs-Appellees on the issue of damages, we must determine that the record contains evidence regarding each factor in the calculation of Defendants-Appellants' net profits from the sale of the Kohaishu knives. The factors constituting net profits are (1) gross income, and (2) costs and expenses. *See Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991). Indeed, "net profits" is defined as "gross revenue less fixed costs, and less variable costs . . . . " *Id.* at 735 (internal quotation marks omitted).[6] Moreover, while the jury must have a legally sufficient basis to support its finding, mere uncertainty to the amount of damages does not require us to enter a judgment as a matter of law in favor of Defendants-Appellees. *Totaro, Duffy, Cannova and Company, L.L.C. v. Lane,*

---

[6] The Parties agreed to define net profits in the jury instructions as "gross income minus costs and expenses." (App. 755.)

*Middleton & Company, L.L.C.*, 191 N.J. 1 (2007); *Tessmar v. Grosner*, 128 A.2d 467, 472 (N.J. 1957).

    3.  <u>Record Evidence Supporting the Jury's Finding of Damages</u>

The jury found that Defendants-Appellants breached the JV by unilaterally selling the Kohaishu knife, and Plaintiffs-Appellees were entitled to damages. (App. 764.) Plaintiff sought compensatory damages for its breach of contract claim, which it asserted to be 50% of the net profits earned on the sale of the Kohaishu knives sold by the Defendants-Appellants.[7] (*See id*. at 753, 755, 899.) Defendants-Appellants do not contest that this is the proper measure of damages, but rather assert that Plaintiffs-Appellees failed to produce legally sufficient evidence proving such damages. Defendant-Appellants' argument falters based on a close examination of this trial record. The documentary and testimonial evidence support the jury's finding here.

    **i.  Purchase Orders**

The record contains purchase orders for the Kohaishu knives from QVC (*see id*. at 819), which is uncontested and a sufficient basis for the jury to determine Defendants-Appellants' gross income from the sale of the knives with "reasonable certainty." *V.A.L. Floors*, 810 A.2d at 631.

---

[7] The jury was only instructed on the law governing damages for Plaintiffs-Appellees cause of action for breach of contract. (App. 753, 758-59.) Thus, we focus our analysis on damages for a breach of contract claim, and not on the other tort-based theories included in the Complaint. Furthermore, the Complaint also sought punitive damages, but the District Court did not submit this issue to the jury. (*See id*. at 671-72.)

There is also evidence in the record demonstrating that in the JV's past sales of Santoku knives[8] to QVC, its net profits equaled the total sales price appearing on the QVC purchase orders. These QVC purchase orders are relevant to the costs and expenses of the Kohaishu knives because "[p]ast experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits with a satisfactory degree of definiteness."[9] *V.A.L. Floors v. Westminster*, 810 A.2d 625, 631 (N.J. Super. Ct. App. Div. 2002) (subcontractor showed reasonably accurate estimate of lost profits, based on subcontractor's past profit experience, to calculate damages). *See also* Restatement (Second) of Contracts, § 352 cmt. b (1981) ("Evidence of past performance will form the basis for a reasonable prediction as to the future."). It is uncontested that the Santoku knives are part of the JV, and the jury found that the Kohaishu knives are also JV products. (App. 764.)

Looking at the QVC purchase orders for the Santoku knives, in conjunction with internal accounting documents of the JV, it is reasonable to conclude that the Parties split 50/50 the total sale price on the QVC purchase order. (*See* App. 808, 810, 815-16.) For example, QVC Purchase Order #471429 indicates that QVC paid the JV, with Reglins as its vendor of record, $312,510.00 for an order of Santoku knives. (*Id*. at 810.) In a later

---

[8] It is uncontested that the Santoku knives are a JV product developed in 2004, which the JV sold to QVC as QVC private-label products. The Kohaishu knives are alleged to be similarly designed to the Santoku knives.

[9] Parenthetically, under New Jersey law, the term "lost profits" refers to a measure of gross income or revenue, less the costs and expenses. *See V.A.L. Floors*, 810 A.2d at 629. This is the same calculation as "net profits" applicable here.

dated invoice sent from Stafford to Reglins, Stafford requested 50% of the sales from Purchase Order #471429, i.e., 50% of $312,510.00, less $139.17 in bank fees for the letter of credit, which came out to $156,115.83. (*Id.* 810, 808.) An accounting reconciliation between the Parties, submitted in evidence by Defendants-Appellants, shows that Reglins owed Stafford $156,115.83 for the letter of credit for the Santoku knives, for Purchase Order #471429. (App. 815-16.)

This documentation, taken together, and in light of the other evidence discussed herein, demonstrates that with regards to the Santoku knives, the sale price on the QVC purchase orders represented the JV's net profits.

Given that QVC bought the Santoku knives and the Kohaishu knives as private-label items, the purchase orders and associated documentation in the record regarding the sales of the Santoku knives support a reasonable inference that Defendants-Appellants' costs and expenses for the Kohaishu knives were likewise reflected in the purchase order sales price. *See V.A.L. Floors*, 810 A.2d at 631.

### ii.  Testimonial Evidence

The record also contains testimony from Levy and his accountant, Daniel Purisch ("Purisch"), supporting the inference that the costs and expenses associated with selling the Kohaishu knives were paid upfront or reimbursed by QVC—not Defendants-Appellants—and thus, for purposes of calculating net profits, costs and expenses were zero.

Levy and Purisch testified that when QVC sells a product under its private label, rather than entering a consignment relationship, QVC's practice is to place purchase orders with the vendor, for which QVC pays the vendor through a letter of credit, regardless of QVC's realized sales of the product. (App. 148-49, 448.) Purisch testified that he was familiar with how QVC paid its vendors for private label items, and usually "the vendor gets the full value [of the purchase order] with very little expenses" because QVC is marketing the product under their own brand name, and thus, bears most of the risks associated with launching the product. (*Id*. at 448.)

Levy also testified, generally, and with specific regards to his past experience selling the Santoku knives, that with QVC private label items, any costs and expenses "were subtracted from the sale price to QVC," i.e., the costs and expenses would "come off the top" of the sales price. (*Id*. at 219-20.) Levy testified that QVC paid the costs associated with shipping, manufacturing, and marketing of the Santoku knives directly to its creditors. (App. 148-49) Levy's past experience selling private label products with QVC "provides a reasonable basis for the computation of [net] profits with a satisfactory degree of definiteness." *V.A.L. Floors*, 810 A.2d at 631.

Levy testified that with respect to the Santoku knives, the following costs and expenses were taken off the top of the sales price in the purchase orders from QVC: a small charge for the cost of the letter of credit, various administrative fees, the cost of the factory, two percent for QVC, the on-air person, and then three percent to Tony Chen, the manufacturer. Furthermore, Levy testified that under the JV, the Parties individually paid

12

for all administrative expenses, office expenses, salaries, etc., and they did not allocate such costs and expenses to the products. (App. 219-20.) Lastly, while the Parties split the cost of tooling[10] 50/50, QVC later reimbursed them for those costs. (*Id*. at 818.)

Levy's testimony, when taken with Purisch's testimony, support the inference that the sales price on the QVC purchase order for the Santoku knives reflected the JV's costs and expenses. When looked at in light of the other evidence of record discussed herein, and drawing all reasonable inferences in favor of Plaintiffs-Appellees, this testimony also supports a logical inference that Defendants-Appellants received the full value of the sales price on the QVC purchase orders for the Kohaishu knives because they did not incur significant costs or expenses themselves. *Lightning Lube*, 4 F.3d at 1166.

### iii. DVD of QVC Advertisement

The record also contains a DVD of a QVC advertisement for the Kohaishu knives where a QVC television personality states that QVC dealt directly with the factory that manufactured the Kohaishu knives, and furthermore, that QVC "eliminates the middle man" to pass on savings to the customer. (Supp. App. 1.) The Defendants-Appellants did not offer contrary evidence, nor did they object to Plaintiffs-Appellees entering the DVD into evidence. Plaintiffs-Appellees argue that the DVD allows the jury to infer that QVC dealt directly with the manufacturer and further that QVC paid the manufacturer directly. (Appellee Br. 30.) Taken together with the other proofs regarding costs and

---

[10] "Tooling" refers to the process of making molds that can mass-produce a product. (App. 144.)

13

expenses, drawing all reasonable inferences in favor of Plaintiffs-Appellees, and keeping in mind that it is not the province of this Court to make credibility determinations or weigh the evidence, the DVD provides further support for the jury's calculation of net profits. *Lightning Lube*, 4 F.3d at 1166. The jury could logically infer from the video that QVC paid the manufacturing costs directly, and that other costs and expenses were zero or minimal.

### iv. Letter From Songson to QVC

A letter from Songson, the Chinese manufacturer of the Kohaishu knives, to QVC dated July 6, 2005, is also in the record. In the letter, Songson lists the JV products, which may demonstrate that Songson had a direct relationship with QVC and the jury could infer that QVC paid Songson directly. This further lends support to the proposition that Defendant-Appellants' costs and expenses were minimal or zero.

### 4. Conclusion

In light of the foregoing, the record is not "critically deficient of the minimum quantum of evidence" upon which a jury could reasonably base its verdict. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009). Indeed the opposite is true. The record contains documentary and testimonial evidence of the JV's experience selling private-label goods to QVC that demonstrate that with the sale of the Santoku knives, the sales price on QVC's purchase order reflected the JV's costs and expenses, and thus the sale price represented the JV's gross income and net profits. There is also tangible evidence (i.e., the DVD and letter) that demonstrate a direct

relationship between QVC and the Chinese manufacturer of the Kohaishu knives, from which the jury could reasonably infer that QVC paid the manufacturer directly. That inference supports the jury's calculation of net profits because if QVC paid the manufacturer for the goods directly, then Defendant-Appellants costs and expenses associated with the Kohaishu knives would be zero and thus the sales price on QVC's purchase order for the Kohaishu knives would equal Defendant-Appellants' net profits. Therefore, we will affirm the District Court's denial of Defendants-Appellants' motion for a judgment as a matter of law.

## B. Motion for New Trial

### 1. Rule 59 Motion for New Trial

Defendants-Appellants' motion for a new trial is governed by Rule 59 of the Federal Rules of Civil Procedure. Rule 59 provides that the court may "grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1). A district court should grant a new trial on the basis that the verdict was contrary to the weight of the evidence "only where a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991). This Court has explained that this stringent standard is necessary "to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does

15

not usurp, the prime function of the jury as the trier of facts." *Sheridan v. E.I. Dupont de Nemours and Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (internal quotation marks omitted).

2. Standard of Review

We use a deferential abuse of discretion standard to review a district court's denial of a motion for a new trial, "unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary." *Lightning Lube*, 4 F.3d at 1167.

3. Jury's Finding of Damages is not Contrary to the Weight of the Evidence

For the reasons discussed above, the jury's finding was based on a legally sufficient evidentiary basis, and was thus, not "contrary to the weight of the evidence." *Williamson*, 926 F.2d at 1352. We therefore reject Defendants-Appellants' argument that "the jury completely disregarded the District Court's instructions regarding net profits . . ." (Defendants-Appellants Br. 31.) Instead, the jury found the evidence presented by Plaintiffs-Appellees credible. Thus, we do not find the jury's verdict to be a miscarriage of justice. Furthermore, the District Court did not abuse its discretion in denying the Defendants-Appellants' motion for a new trial. *Williamson*, 926 F.2d at 1344. We will affirm the District Court's denial of Defendants-Appellants' motion for a new trial.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the District Court's denial of Defendants-Appellants' motion for a judgment as a matter of law, and its denial of

Defendants-Appellants' motion in the alternative seeking the grant of a new trial.